OPINION
{¶ 1} This is an appeal by defendant-appellant, Michael Alexander, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of theft and forgery.
 {¶ 2} On December 14, 2004, appellant, along with Charles Taylor, was indicted on charges of theft, in violation of R.C. 2913.02, and forgery, in violation of R.C. 2913.31. The indictment alleged that appellant and Taylor had committed the offenses against Bob Evans Restaurants ("Bob Evans") over a period of time from September 14, 2002 through *Page 2 
October 21, 2003. Taylor eventually entered into a plea agreement; he received a jail sentence and was ordered to pay restitution.
 {¶ 3} Appellant's case came for trial before a jury beginning April 24, 2006. At trial, the state's theory of the case was that appellant, the owner of a computer business, and Taylor, then an employee of Bob Evans, devised a scheme to submit bills to Bob Evans for work that was never performed.
 {¶ 4} The state presented evidence that Bob Evans owns the Southland Mall and rents out space to various commercial tenants. Appellant owned a computer and sign company, MCS, located in the Southland Mall. During the relevant time period, Taylor was employed by Bob Evans, and was in charge of repair and maintenance to the Southland Mall building; he was also in charge of the mailroom, copy center, and security. Taylor became acquainted with appellant through a mutual friend.
 {¶ 5} At trial, Taylor testified that he and appellant agreed to submit invoices from MCS to Bob Evans for services purportedly performed by MCS at Southland Mall. According to Taylor, after MCS submitted the invoices, Taylor would approve them for payment, even though MCS had not performed the work. The invoices would reflect parts or services that other vendors performed for Bob Evans. Taylor would deliver the checks to appellant, and appellant in turn would cash the checks and give Taylor approximately 40 percent. During his testimony, Taylor admitted he was involved in the theft of this money from Bob Evans, and that appellant assisted him.
 {¶ 6} In the fall of 2003, Bob Evans officials became suspicious of the MCS billing practices. Tony Valore, the internal audit manager for Bob Evans, and a certified public accountant, began an internal audit of the company's business records. It was *Page 3 
discovered that a number of invoices submitted by MCS involved items for which Bob Evans already had established vendors. Those items included toner, toner cartridges, boiler repairs, and security cameras. Valore prepared a spreadsheet, identified at trial as state's Exhibit "A," listing each invoice from MCS for which Bob Evans, according to Valore, did not receive the service. Based upon records submitted by the state, the total amount billed by MCS to Bob Evans over the relevant time period was $113,516.85.
 {¶ 7} Columbus Police Detective Jim O'Brien conducted an investigation beginning in November 2003. As part of the investigation, he subpoenaed bank records and tax returns for MCS, and traced checks from appellant's business to Bob Evans' employee Taylor. Over a period of months, approximately 74 percent of the total sales for MCS came from billings to Bob Evans.
 {¶ 8} Detective O'Brien eventually interviewed appellant, and the interview was tape recorded and played for the jury at trial. During the interview, appellant told the detective that he worked with Taylor on a cash basis. Appellant noted: "It was strange, but that's what it was." (Tr. Vol. I, at 66.) Appellant told the detective, "I mark my stuff up 10 percent and I passed the bill on." (Tr. Vol. I, at 67.) During the interview, appellant told Detective O'Brien he made cash payments to a company, A D, for work done for Bob Evans. Appellant gave the detective the address for A D as 3850 Sullivant Avenue.
 {¶ 9} During a subsequent interview, appellant identified cash receipts he had paid to A D. Appellant told the detective that Taylor would call him and indicate what he needed done. He stated that Taylor would "pay A D straight up." (Tr. Vol. I, at 91.) Appellant acknowledged telling the detective during the first interview that he paid A D, but stated during the subsequent interview that it was Taylor that made cash payments to *Page 4 
A D. Also during the interview, appellant stated: "I didn't try to stick anybody. You know what, I'm a legit business. * * * So what if I get a kickback off the deal, like selling cars." (Tr. Vol. I, at 95.)
 {¶ 10} At the close of the state's case-in-chief, appellant made a Crim.R. 29 motion for acquittal, which the trial court denied. Appellant's wife testified on his behalf, and appellant also presented the testimony of a certified public accountant.
 {¶ 11} Following deliberations, the jury returned verdicts finding appellant guilty of one count of theft and five counts of forgery. By entry filed May 31, 2006, the trial court sentenced appellant on the various counts, imposing total prison time of 59 months incarceration.
 {¶ 12} On appeal, appellant sets forth the following six assignments of error for this court's review:
 ASSIGNMENT OF ERROR I: THE STATE OF OHIO PRESENTED INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR THEFT AND FIVE COUNTS OF FORGERY AND THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING THE DEFENDANT'S CRIMINAL RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL.
 ASSIGNMENT OF ERROR II: THE DEFENDANT'S CONVICTION FOR THEFT AND FIVE COUNTS OF FORGERY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR III: PORTIONS OF THE TAPE RECORDED INTERVIEW BETWEEN THE DEFENDANT AND DETECTIVE O'BRIEN CONTAINED INADMISSIBLE HEARSAY WHICH WAS INHERENTLY PREJUDICIAL TO THE DEFENDANT'S CASE.
 ASSIGNMENT OF ERROR IV: THE TRIAL COURT ERRED BY NOT GIVING THE JURY A CURATIVE INSTRUCTION *Page 5 
FOLLOWING THE INTRODUCTION OF INADMISSIBLE HEARSAY DURING THE TESTIMONY OF TONY VALORE.
 ASSIGNMENT OF ERROR V: THE TRIAL COURT ERRED BY PERMITTING THE STATE OF OHIO TO AMEND THE INDICTMENT, ONCE IMMEDIATELY PRECEDING CLOSING ARGUMENTS, AND AGAIN DURING JURY DELIBERATIONS FOLLOWING A JURY QUESTION.
 ASSIGNMENT OF ERROR VI: THE DEFENDANT'S TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL, AND THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL.
 {¶ 13} Appellant's first and second assignments of error are interrelated and will be considered together. Under his first assignment of error, appellant asserts that the trial court erred in failing to grant his motion for judgment of acquittal. Appellant maintains that the state presented insufficient evidence to sustain a conviction for theft and five counts of forgery. Under his second assignment of error, appellant challenges his convictions as against the manifest weight of the evidence.
 {¶ 14} Crim.R. 29(A) states as follows:
 * * * The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.
 {¶ 15} In State v. Darrington, Franklin App. No. 06AP-160,2006-Ohio-5042, at ¶ 15-16, this court discussed the applicable standards of review in considering a motion for judgment of acquittal and a challenge based upon weight of the evidence, stating as follows: *Page 6 
 A motion for judgment of acquittal, pursuant to Crim.R. 29, tests the sufficiency of the evidence. State v. Knipp, Vinton App. No. 06CA641, 2006-Ohio-4704, at P11. Accordingly, an appellate court reviews a trial court's denial of a motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim. State v. Barron, Perry App. No. 05 CA 4, 2005-Ohio-6108, at P38.
 Sufficiency of the evidence and weight of the evidence are distinct legal concepts. State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617. In Sexton, at P30-31, this court discussed those distinctions as follows:
 To reverse a conviction because of insufficient evidence, we must determine as a matter of law, after viewing the evidence in a light most favorable to the prosecution, that a rational trier of fact could not have found the essential elements of the crime proven beyond a reasonable doubt. * * * Sufficiency is a test of adequacy, a question of law. * * * We will not disturb a jury's verdict unless we find that reasonable minds could not reach the conclusion the jury reached as the trier of fact. * * * We will neither resolve evidentiary conflicts in the defendant's favor nor substitute our assessment of the credibility of the witnesses for the assessment made by the jury. * * * A conviction based upon legally insufficient evidence amounts to a denial of due process, * * * and if we sustain appellant's insufficient evidence claim, the state will be barred from retrying appellant. * * *
 A manifest weight argument, by contrast, requires us to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. * * * Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those determinations is superior to that of a reviewing court. * * * Nonetheless, we must review the entire record. With caution and deference to the role of the trier of fact, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury, as the trier of facts, clearly lost its way, thereby creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial *Page 7 
ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * *
 {¶ 16} Under Ohio law, "theft by deception" is defined as follows: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." R.C. 2913.02(A)(3).
 {¶ 17} R.C. 2913.31 defines "forgery" as follows:
 (A) No person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following:
 (1) Forge any writing of another without the other person's authority;
 (2) Forge any writing so that it purports to be genuine when it actually is spurious, or to be the act of another who did not authorize that act, or to have been executed at a time or place or with terms different from what in fact was the case, or to be a copy of an original when no such original existed;
 (3) Utter, or possess with purpose to utter, any writing that the person knows to have been forged.
 {¶ 18} In arguing that his convictions were not supported by sufficient evidence, appellant argues that, at most, the evidence presented by the state was that service contracts existed with other businesses that covered similar work. Appellant maintains that the existence of service contracts covering similar work does not translate into evidence that MSC, or one of its subcontractors, did not perform the work.
 {¶ 19} In making this argument, appellant appears to focus solely upon the testimony of one witness, Valore. Specifically, appellant points to several questions on cross-examination of Valore, including the following inquiry: "Do you ever fully go out and *Page 8 
make sure that jobs are being done?" (Tr. Vol. II, at 232-233.) Valore responded, "No. No." (Tr. Vol. II, at 233.)
 {¶ 20} Appellant's argument ignores Taylor's testimony that he knew the work being billed was never performed. According to Taylor, he "needed to make some extra money," so he and appellant "talked about doing some invoices he would submit through MCS for various sundries that we use there, toners, repairs on various equipment, different things." (Tr. Vol. II, at 255.) Taylor and appellant began submitting the invoices in September 2002. More specifically, appellant submitted the invoices and Taylor "approved them for payment." (Tr. Vol. II, at 255.) Taylor would first pick up the invoices from appellant at the MCS store; he would approve an invoice and submit it for payment, turning it in to the accounting department, usually receiving a check back that day.
 {¶ 21} After Taylor received approval for a check, and actually obtained a check, he would take it to appellant's office. Usually within a day or two, Taylor received cash back, "about 40 percent of the value of the check." (Tr. Vol. II, at 258.) Taylor deposited most of the money he received into his checking account. Taylor explained why he settled for 40 percent of the money received, stating that the agreement "was going to be 50/50 but since it was going through his [appellant's] company and he'd have to pay income tax on it, he had to have enough to cover the taxes he'd have to pay." (Tr. Vol. II, at 286.)
 {¶ 22} In deciding what items to put on the invoice, Taylor testified that he put items "I thought I could get through." (Tr. Vol. II, at 256.) Those items included "[c]opy machine toner, binding tapes, * * * some camera repairs. Just general items like that." *Page 9 
(Tr. Vol. II, at 256.) Taylor noted that other providers of services, including Danka, Gordon Flesch, Acree Daily, Air Force One, and Wenger Temperature Control, provided some of the work appearing on the invoices. Taylor acknowledged that he was able to get those items approved on a regular basis, totaling over $100,000. When asked whether any of this work was ever done, he responded "No." (Tr. Vol. II, at 257.)
 {¶ 23} Further, despite Valore's response during cross-examination, cited above, that he did not "fully" go out and make sure all jobs were being performed, Valore testified that his investigation revealed no evidence that MCS performed the work at issue. At trial, Valore identified a number of invoices submitted by MCS covering items already under other service contracts by Bob Evans.
 {¶ 24} At trial, counsel for appellant stressed appellant's statements, made during his interviews with Detective O'Brien, that A D was paid for work performed for Bob Evans. The state, however, presented evidence casting serious doubt on appellant's claim. Specifically, Detective O'Brien testified that he investigated A D; when he drove to the address on Sullivant Avenue, he learned A D was not currently a tenant. His investigation revealed that a lease agreement between Bruce Williamson and Jason Davis, doing business as A D, had been signed, with a term of lease beginning June 1, 2003, and ending May 31, 2006. Detective O'Brien later discovered that Jason Davis was incarcerated at Orient Correctional Facility from September of 2002 until January of 2003. According to Detective O'Brien, approximately half of the receipts attributed to A D covered a period of time in which that entity did not occupy the Sullivant Avenue location.
 {¶ 25} Upon review, the state presented extensive evidence regarding the activities of appellant and Taylor in submitting numerous questionable invoices for *Page 10 
payment. Although appellant's defense was that MCS, A D, or a subcontractor performed the services that were billed, the trier of fact was free to disbelieve such explanation, and to find instead that the billing invoices were falsified, and that the work was never performed. Here, in construing the evidence most strongly in favor of the state, there was sufficient evidence to support the convictions for theft and forgery.
 {¶ 26} Regarding appellant's manifest weight argument, appellant primarily challenges the credibility of Taylor. Appellant argues that Taylor received a lighter sentence than him, and maintains that Taylor's testimony was self-serving.
 {¶ 27} The jury, however, was aware of Taylor's agreement to testify against appellant and, as trier of fact, was entitled to give as much or little weight to his testimony as it deemed appropriate. In light of the verdict rendered, the jury apparently found his testimony credible, which was within its province. Upon review, we find no basis to disturb such determination. See State v. Woodward, Franklin App. No. 03AP-398,2004-Ohio-4418, at ¶ 26 ("[a]n appellate court may not substitute its judgment for that of the jury on issues involving the weight of the evidence unless it is manifestly clear that the jury lost its way in arriving at the verdict"). Here, the jury's acceptance of Taylor's testimony did not render the verdicts against the manifest weight of the evidence.
 {¶ 28} Based upon the foregoing, appellant's first and second assignments of error are without merit and are overruled.
 {¶ 29} Under his third assignment of error, appellant contends that portions of a tape-recorded interview by Detective O'Brien contained inadmissible hearsay which was prejudicial to his case. Appellant argues that the hearsay evidence involved declarations regarding billed work that had not been performed by appellant. Appellant acknowledges *Page 11 
that his trial counsel did not object to the playing of the entire tape, but that counsel did request a limiting instruction. Appellant further acknowledges that the trial court provided a limiting instruction, but appellant maintains that the instruction was too restrictive and did not adequately alleviate the prejudice to him.
 {¶ 30} The record indicates that, following the playing of the tape, defense counsel expressed concern about statements made by the detective regarding "what Jason Davis said." (Tr. Vol. I, at 124.) In response, the prosecutor noted that defense counsel had not objected before the tape was played. The trial court then suggested the following instruction to the jury: "Any statements made by the detective concerning what Jason Davis said were not admitted for the truth of the matter asserted but were used as an investigative technique to obtain or attempt to obtain reaction from Mr. Alexander." (Tr. Vol. I, at 126.) Counsel for appellant expressed satisfaction with the proposed instruction, and the trial court subsequently gave the above instruction.
 {¶ 31} Under Ohio law, in the absence of plain error, "the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal." State v. Underwood (1983),3 Ohio St.3d 12, 13.
 {¶ 32} In the instant case, appellant has failed to demonstrate plain error. A jury is presumed to follow instructions given to it by a trial court. State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, at ¶ 147. We therefore assume the jury followed the court's admonition which, as noted above, counsel for appellant expressed satisfaction with. Further, any potential prejudice was mitigated by the fact the challenged evidence was duplicative of testimony presented by Valore, the internal audit manager for Bob Evans, as well as Taylor. *Page 12 
 {¶ 33} Accordingly, appellant's third assignment of error is without merit and is overruled.
 {¶ 34} Under the fourth assignment of error, appellant asserts that the trial court erred by not giving the jury a curative instruction following the introduction of purported hearsay testimony. More specifically, appellant points to the following exchange during the state's direct examination of Valore:
 Q. Were you able to get any [kind] of service agreements or any kind of warranty agreements that showed that something was — somebody was covering this work?
 A. Yes. * * * And in all these cases we had established vendors that were supplying these materials and we had service contracts. * * * The security cameras, we have a company that we've done business with for many, many years and in talking to our head of security, again, I just asked him, did you ever work with MCS. He said no. We never bought any cameras-
 [Defense Counsel]: I'm going to object.
 THE COURT: Sustained on the hearsay.
(Tr. Vol. II, at 212-213.)
 {¶ 35} Appellant argues that, despite the sustained objection, the jury still heard the witness provide inadmissible hearsay. Appellant maintains that the jury should have been instructed to disregard Valore's statement regarding what the head of security allegedly stated.
 {¶ 36} As noted, trial counsel objected to the comment and the objection was sustained. Counsel, however, did not request that a curative instruction be given, or that the comment be stricken. In general, "where a party fails `to follow up its objection with a motion for mistrial or alternatively to strike the answer and give a curative instruction,'" *Page 13 
that party waives its right to assert the error on appeal. City of Akronv. Niepsuj, Summit App. No. 21280, 2003-Ohio-3791, at ¶ 17. Further, "the decision whether to give a curative instruction lies within the sound discretion of the trial court, and will not be reversed on appeal unless the decision is unreasonable, arbitrary, or unconscionable."State v. Hartman (Apr. 5, 1999), Clermont App. No. CA98-06-040. Upon review, appellant has failed to show an abuse of discretion by the trial court. Nor are we convinced, based upon the evidence presented in this case, that the jury would have reached a different verdict in the absence of this single comment.
 {¶ 37} Appellant's fourth assignment of error is overruled.
 {¶ 38} Under his fifth assignment of error, appellant asserts that the trial court erred by permitting the state to amend the indictment on two separate occasions. Specifically, appellant notes that immediately prior to closing arguments, the state made a motion to amend the indictment with respect to Count 2, changing the invoice number from 3477 to 3152. Over trial counsel's objection, the trial court allowed the amendment. Further, during jury deliberations, the jurors submitted a question to the trial court concerning the invoice number in Count 5. The trial court indicated the invoice number should read 3307, rather than 5181. Again, the amendment was made over the objection of trial counsel. Appellant asserts that the amendments changed the identity of the offenses, and that he was prejudiced because he was not adequately notified of the charges against him.
 {¶ 39} In response, the state argues that the amendments involved two typographical errors with respect to the invoice numbers at issue, and that the amendments did not alter the date or amount of the invoices; rather, they merely *Page 14 
corrected those invoice numbers. The state maintains that such amendment was permissible under Crim.R. 7(D), and that appellant did not suffer prejudice because he had notice as to the facts of each charge and was not prevented from preparing a defense. Upon review, we agree.
 {¶ 40} Crim.R. 7(D) states in part as follows:
 * * * The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information, or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury. * * *
 {¶ 41} In the present case, Count 2 of the indictment alleged in part that appellant, on or about October 10, 2002, in violation of R.C.2913.31, "with purpose to defraud or knowing that he was facilitating a fraud, did forge a writing, to wit: invoice #3477 so that it purported to be genuine when it was actually spurious[.]" That count further alleged that appellant "did utter * * * a writing, to wit: an invoice billed to Bob Evans made payable to MCS Inc. for the amount of * * * ($6,133.50) which he knew to have been forged[.]" Count 5 of the indictment alleged in part that appellant, in violation of R.C. 2913.31, "with purpose to defraud or knowing that he was facilitating a fraud, did forge a writing, to wit: invoice #5181, so that it purported to be genuine when it was actually spurious[.]" *Page 15 
Further, that appellant "did utter * * * a writing, to wit: invoice billed to Bob Evans made payable to MCS Inc. for the amount of * * * ($5,181.75) which he knew to have been forged[.]"
 {¶ 42} Prior to closing argument, the state requested that the trial court amend Count 2 of the indictment to change the invoice number from 3477 to 3152. Over the objection of trial counsel, the trial court allowed the amendment on the basis that it constituted a typographical error. Further, during jury deliberations, the jurors sent a question to the trial court regarding invoice number 5181. The trial court noted on the record that there was no invoice number 5181, and that "Count Five should read 3307 and that the jury is entirely correct." (Tr. Vol. II, at 427.) The trial court noted that the "date and the amount that are listed in invoice number 3307 match up precisely with the date and the amount — dollar amount in Count Number Five of the indictment." (Tr. Vol. II, at 427.) The trial court again allowed the amendment to the indictment "to correct a typographical error." (Tr. Vol. II, at 427.)
 {¶ 43} As noted by the state, this court has previously found no error under similar circumstances. Specifically, in State v. Graham (June 24, 1980), Franklin App. No. 79AP-878, the trial court granted the state's motion to amend an indictment, including the correction of typographical errors regarding check numbers in a multi-count indictment alleging forgery under R.C. 2913.31. In Graham, this court rejected appellant's contention that the trial court erred in allowing the amendment of the indictment, finding that correction of the typographical errors "did not change the name or identity of the crime charged, which was forgery." Id. *Page 16 
 {¶ 44} Similarly, in the instant case, appellant suffered no prejudice as the amendments did not change the name or identity of the offense. Rather, as found by the trial court, the amendment of the invoice numbers corrected a typographical error, and such amendment was permissible under Crim.R. 7(D).
 {¶ 45} Based upon the foregoing, appellant's fifth assignment of error is without merit and is overruled.
 {¶ 46} Under his sixth assignment of error, appellant raises a claim of ineffective assistance of trial counsel. Appellant argues that his counsel was ineffective in failing to object to the playing of the entire taped interview with Detective O'Brien, and in failing to request a curative instruction during the testimony of Valore.
 {¶ 47} In State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, the Ohio Supreme Court noted the applicable standard in reviewing a claim of ineffective assistance of counsel, stating:
 2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle [1976], 48 Ohio St.2d 391 * * *; Strickland v. Washington [1984], 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)
 3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.
 {¶ 48} Regarding the playing of the tape, the state argues that the record indicates that trial counsel allowed the entire tape to be played as part of trial strategy. The state notes that, following the playing of the tape, at the time defense counsel requested a *Page 17 
limiting instruction, defense counsel stated on the record: "Before we started the tape I indicated to the Court at sidebar * * * that I was concerned about some of the statements that were made and some of the testimony by the detective and I wanted to get a limiting instruction." (Tr. Vol. I, at 119.) Counsel further explained, the "problem is if we went and redacted every single thing, every statement of hearsay, every opinion this officer has it would be very difficult and wouldn't put the statements into context." (Tr. Vol. I, at 119.) Defense counsel later stated: "[F]or me to go through and have you redact it it wouldn't make any sense. So that's why I approached with a limiting instruction[.]" (Tr. Vol. I, at 125.)
 {¶ 49} We agree with the state that the record reflects a strategic decision by trial counsel to allow the entire tape to be played. As reflected above, trial counsel sought to avoid the jury hearing statements out of context. In considering a claim of ineffective assistance of counsel, "trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance." State v. Cook (1992), 65 Ohio St.3d 516, 524. Thus, "[c]ourts must be highly deferential to counsel's performance and will not second-guess trial strategy decisions." State v. Hoffner,102 Ohio St.3d 358, 2004-Ohio-3430, at ¶ 47. Further, "`strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" State v. Williams,99 Ohio St.3d 493, 2003-Ohio-4396, at ¶ 125, quoting Strickland v.Washington (1984), 466 U.S. 668, 690, 104 S.Ct. 2052.
 {¶ 50} Here, appellant has not shown that his counsel's strategy was either unreasonable or prejudicial. Counsel's decision to allow the tape to be admitted in its entirety allowed the jury to hear appellant, who did not testify at trial, explain his side of *Page 18 
the story, including his claim that A D performed services for Bob Evans. This provided an alternative to appellant being subject to cross-examination, and counsel's decision was the type of trial strategy well within the range of reasonable professional assistance.
 {¶ 51} Finally, regarding counsel's failure to request a curative instruction, even assuming, without deciding, that appellant could somehow show deficient performance, he has failed to show prejudice. We have addressed this issue under the fourth assignment of error, and there is no reasonable probability the outcome would have been different in the absence of the challenged comment.
 {¶ 52} Accordingly, the sixth assignment of error is without merit and is overruled.
 {¶ 53} Based upon the foregoing, appellant's first, second, third, fourth, fifth, and sixth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
 SADLER, P.J., and FRENCH, J., concur. *Page 1