[Cite as *State v. Weston*, 2014-Ohio-4252.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 12 MA 122 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| DORETHA WESTON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from Youngstown
Municipal Court, Case Nos.
11CRB941; 12CRB509; 12TRD735.

JUDGMENT: Affirmed.

APPEARANCES:
For Plaintiff-Appellee: Attorney Martin Hume
City Law Director
26 S. Phelps Street
Youngstown, OH 44503

For Defendant-Appellant: Attorney Rhys Cartwright-Jones
42 N. Phelps Street
Youngstown, OH 44503

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated: September 24, 2014

DeGenaro, P.J.

{¶1} Defendant-Appellant, Doretha Weston, appeals the August 30, 2012 judgment convicting her of obstructing official business and driving under suspension and sentencing her accordingly. On appeal, Weston asserts that the trial court erred by overruling her motion to dismiss for vindictive prosecution and argues that certain comments made by the prosecutor during closing arguments constitute plain error.

{¶2} Weston's arguments are meritless. A presumption of vindictive prosecution was not established; the prosecutor exercised his discretion to file misdemeanor driving under suspension and resisting arrest charges against Weston, which she was subject to from the outset. And while some of the prosecutor's comments during closing were improper, they did not rise to the level of plain error. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶3} On March 30, 2011, Weston and her friend Desiree Johnson were arrested following a traffic stop by two officers working undercover; Weston was the driver of the vehicle and Johnson the passenger. As a result of incidents relating to that stop, on March 31, 2011, Weston was charged with felony obstructing official business, R.C. 2921.31(A) & (B), resisting arrest, R.C. 2921.33(A), and driving under suspension, Y.C.O. 335.07(A) both misdemeanors, and a turn signal violation, Y.C.O. 331.14.[1]

{¶4} On April 8, 2011, Weston and Johnson appeared in the Youngstown Municipal Court with counsel and waived their right to a preliminary hearing on the felony counts and consented to have their cases being bound over to the Mahoning County Grand Jury and the State agreed to dismiss the misdemeanor charges without prejudice. A review of the trial court docket reveals that, although a filing entitled Rule 11 Agreement was filed for both Weston and Johnson, the content suggests that they were mere dismissal entries. Both are standardized computer forms used by the trial court with fields for case specific information. It is noteworthy that neither filing contains the information typically found in a Rule 11 plea agreement, i.e., the original and amended charges, the original

---

[1] Johnson was charged with two counts of assault on a peace officer, R.C. 2903.13, and obstructing official business, R.C. 2921.31(A) & (B), all felonies, and misdemeanor resisting arrest, R.C. 2921.33(A).

and amended pleas, the potential penalties for the original and amended charges, and the agreed or recommended sentence. There was very limited information.

{¶5} In Johnson's case, the only specific fields that were filled in were as follows: 1) "I <<DESIREE JOHNSON>> BEING BEFORE THIS COURT * * * " 2) "THE STATE OF OHIO MOVES TO DISMISS THE FOLLOWING: W/O PREJUDICE <<RESISTING ARREST>> ; and 3) the electronic signatures of Johnson, her attorney, the prosecutor, and "RULE 11 DISMISSED W/O PREJUDICE JUDGE MILICH." In Weston's case, only the second and third items were filled out identically to Johnson's, but for her and her counsel's electronic signature.

{¶6} On May 12, 2011, the grand jury declined to indict the felony charges; instead indicting both Weston and Johnson with misdemeanor obstructing official business, R.C. 2921.31, and returning the cases to the Youngstown Municipal Court. Weston executed a speedy trial waiver and filed a jury demand.

{¶7} At some point during the proceedings, Weston and Johnson made an internal affairs complaint against the arresting officers and filed a section 1983 civil rights action against them in federal court alleging police brutality. Several investigations into the incident by law enforcement ensued. Additionally, Weston and Johnson filed a motion requesting an independent private investigator be commissioned, which the trial court granted.

{¶8} After the conclusion of multiple investigations, on March 15, 2012, the State re-filed two charges against Weston; driving under suspension, Y.C.O. 335.072(A), and resisting arrest, R.C. 2921.33(B), both misdemeanors, arising from the March 30, 2011 incident.[2]

{¶9} On May 25, 2012, Weston and Johnson filed a joint motion seeking to dismiss the new charges on the grounds of prosecutorial vindictiveness and/or a broken plea bargain. In their joint motion, counsel alleged that the March 15, 2012 charges were re-filed in retaliation for a §1983 federal civil rights suit filed by Johnson and Weston, which alleged police brutality based upon the arrests for the instant offenses. However, the

---

[2] Charges were also re-filed against Johnson; two counts of assault, R.C. 2903.13, and resisting arrest, R.C. 2921.33, all misdemeanors, arising from the March 30, 2011 incident.

motion contained typographical errors concerning the date that suit was filed, among other errors.

{¶10} At the hearing, testimony from Youngstown Police Department Lieutenant Brian Butler and City Law Director Anthony Farris revealed that a meeting was held with Butler, Farris, then City Prosecutor Jay Macejko and others from the City Prosecutor's Office to discuss the propriety of re-filing charges against the defendants.

{¶11} Butler testified that he oversees the internal affairs department and that an internal affairs complaint had been filed, was investigated, and the allegations were determined to be unfounded. At some point, Butler became aware the defendants had filed civil rights actions against the city, and had talked to individuals in the prosecutor's office about the issue. In addition, it was revealed during later testimony by Farris that Johnson had filed an earlier civil rights action against the city regarding police conduct toward her son. Butler's testimony concerning the civil suits did not differentiate well between these two lawsuits; it was more general in nature and did not specify the timing of the suits in relation to the meeting of city officials. Butler further testified that the decision to re-file charges was not a reaction to any civil lawsuit or to the fact that the defendants had filed a jury demand in their criminal cases. Instead, he "absolutely" believed there was probable cause to support the re-filed charges based upon his review of the case. He did not know why it took 10 months from the time the grand jury returned the misdemeanor charge to the time charges were re-filed.

{¶12} Farris testified that during the meeting among city officials, Macejko appeared reluctant to re-file the charges and was concerned doing so would "look bad." Farris explained that there were concerns that "Macejko might have some animosity towards [Lieutenant] Mercer," and that this animosity might have contributed to Macejko's resistance to re-filing the charges. "There was clearly some sort of conflict that was present that had led to the delay [in re-filing the charges.]" Farris said he had a discussion with Macejko about re-filing the charges, but did not order the prosecutor's office to do so; ultimately that decision was made by Macejko. Farris expressed his opinion that re-filing the charges was appropriate and consistent with established policy and that when he was a prosecutor and

a charge was dismissed without prejudice it was done so with the understanding that the charges might be re-filed at a later date.

{¶13} Farris further testified that as law director he was aware that there was an earlier civil action filed by Johnson regarding police conduct towards her son, as well as the civil action filed regarding the Weston and Johnson arrest. Farris emphasized that the charges were not re-filed in retaliation to the defendants' jury demand or their civil lawsuits. He said that when he had the meeting with Macejko he was unaware that there was a settlement conference coming up for one of the federal civil cases. Finally, he affirmed that neither he, nor any prosecutor had a personal stake in the civil actions.

{¶14} Michael Gollings, Johnson's counsel, testified that his understanding of the agreement was that the misdemeanor charges had been dismissed without prejudice in exchange for the defendants waiving their right to a preliminary hearing on the felony counts. Gollings opined that it was unusual for charges to be re-filed after they had been dismissed in such a manner, but conceded that a dismissal without prejudice means the charges may be re-filed at a later date.

{¶15} On June 5, 2012, the trial court overruled the motion to dismiss, and a joint jury trial for Weston and Johnson commenced that day. The State filed a motion in limine asking the court to disallow evidence of any mention of any civil lawsuits filed by the defendants against the arresting officers and the City. In particular, the State did not want the defendants to testify or reference the earlier encounter, internal affairs complaint, and lawsuit involving Johnson's son Benji which was pending against the City prior to the March 30, 2011 incident. The trial court overruled the motion, determining that the evidence was admissible.

{¶16} The State first called Darlene Jones, a supervisor at the Ohio Bureau of Motor Vehicles, who testified that Weston's license was under suspension on the date of the incident, and authenticated the BMV record of the suspension. Jones testified that Weston knew her license was suspended at that time, because she signed a suspension notice form on February 23, 2009, which was admitted into evidence. Moreover, during her testimony later in the trial, Weston reluctantly acknowledged her signature, after first asserting that Jones was lying.

**{¶17}** Officer Patrick Mulligan testified that he and his partner Lieutenant Kevin Mercer were working undercover for the street crimes unit at the time of the incident, and not wearing uniforms or driving a marked police vehicle. After observing the vehicle turn without signaling, they followed the car for a short distance and then initiated a traffic stop. Mulligan identified Weston as the driver and Johnson as the passenger. Initially, Mulligan had contact with Johnson and Mercer with Weston. Mulligan asked Johnson for identification and she initially denied having it. Mulligan asked again, " 'Do you have identification on you at all?' " Johnson responded: "I don't have to give it to you." In the meantime, Mercer was talking to Weston, who told him she did not have identification. Mercer also asked Johnson for identification, apparently not realizing that Mulligan had already requested it. When Weston heard Mercer's inquiry to Johnson she became irate, saying " 'What do you need her I.D. for?' "

**{¶18}** Mulligan testified that Mercer then asked Weston to get out of the vehicle but she refused, grabbing onto the steering wheel, and then Mercer grabbed Weston's arm to extract her from the vehicle "and that's when she stated 'I know my rights, I am not getting out,' and then she locked herself tighter around the wheel." Mercer then extracted Weston from the vehicle by pulling her out forcibly. Mulligan recounted that after Mercer pulled Weston out of the vehicle, Weston went to the ground and started flailing her arms for about 20 seconds to avoid being handcuffed. Mulligan, who had been dealing with Johnson, went to assist Mercer by placing the handcuffs on Weston. Mercer stood Weston up and walked her to the cruiser.

**{¶19}** Mulligan testified that when he returned to Johnson, who was still in the car, he saw she was making a call on her cell phone and he asked Johnson to get off of the phone; however, she refused. Mulligan explained that allowing people to talk on cell phones during traffic stops poses a safety risk for officers. Mulligan gave Johnson several opportunities to get off of the phone, but she continued to refuse. Johnson began screaming obscenities at Mulligan and he asked her to step out of the vehicle for the last time, but she refused. Mulligan then attempted to take the phone from Johnson, but in the process, his hand caught on her wig and knocked it off her head, along with the phone, into

the backseat.  According to Mulligan, this angered Johnson and she got out of the car and started swinging at him.

**{¶20}** Mulligan was limited in his ability to restrain Johnson, who weighed 315 pounds according to the ambulance report admitted into evidence, because "I had recently had a hernia surgery and I was out for one month.  I returned to work on March 2nd.  This event occurred on March 30th.  I was not fighting with somebody over 100 pounds more than me risking injuring myself."  Mulligan testified that Johnson struck him in the face two times, after which Mercer came over to break up the scuffle and assist, but Johnson continued to resist, punching both officers.  They eventually got her to the ground by Mulligan extending his leg to trip her, while Mercer hit Johnson in the stomach with his knee to knock her down.  Johnson continued to kick and punch while on the ground, and Mercer struck Johnson twice in the neck area with his fist to finally subdue her.  Mulligan stated that Mercer used only the amount of force necessary to gain compliance, and that the level of force used was appropriate based upon his training and experience.  At that point, Weston got out of the police vehicle to protest the officers' actions towards Johnson.  While Mercer went to detain Weston, Mulligan was able to place handcuffs on Johnson after he threatened to use a taser on her.

**{¶21}** Back-up officers arrived, one of whom got Johnson off of the ground and placed her in his cruiser.  During an inventory search of Weston's vehicle identification cards for both women were found.  A records search revealed that Weston was driving with a suspended license and Johnson had an outstanding warrant.

**{¶22}** Mulligan then identified photos that showed the parties following the incident. Joint Exhibit 3 shows the injury to Mercer's face from the struggle with Johnson, specifically there is a scratch mark on Mercer's right cheek, stretching from the top of his forehead to the jawline; blood is drawn on parts of the wound.  Joint Exhibits 4 and 5 show Johnson after the struggle; Exhibit 5 shows that Johnson has a cut inside her lower lip; Exhibit 4 shows that the outside of her lower-left lip is swollen.  She has no other visible injuries. Joint Exhibit 6 shows an abrasion to Mulligan's nose from being hit by Johnson.  Mulligan testified that neither he nor Mercer had injuries to their faces before the incident with Weston and Johnson.  Joint Exhibit 7 is a photograph of Weston that was taken after back-

up had arrived, in which she is posing for the camera and smiling broadly, with no visible injuries.

{¶23} During the incident, one of the calls Johnson made was to 911, and the call was played for the jury. Mulligan identified Johnson's voice on the tape, and where he told her several times to get off of the phone and get out of the car. The tape was admitted into evidence in addition to being played for the jury, but it is missing from the record on appeal, and attempts by this court to locate it with the court reporter and counsel were unsuccessful. As it is the appellant's burden to provide a complete record for review, this court must presume the regularity of the proceedings. *See* App.R. 9(B); *State v. Dumas*, 7th Dist. No. 06 MA 36, 2008-Ohio-872, ¶14. Here this requires us to take as true Mulligan's testimony about the contents of the 911 call.

{¶24} Mercer was not called to testify. The State rested and Weston and Johnson made Crim.R. 29 motions for acquittal, which were overruled by the trial court. The defense presented the testimony of Johnson, Weston and Marietta Wilson, who lived nearby and witnessed part of the incident.

{¶25} Johnson testified that she was not feeling well that day and Weston took her to play the lottery at a store near the Pennsylvania border. They returned to Youngstown where they were followed by the undercover officers and subsequently pulled over. Johnson said she immediately recognized the officers as being involved in an earlier incident involving her son, Benji.

{¶26} According to Johnson, Weston asked why they were being pulled over, and Mercer explained she had failed to signal. She said Mercer told Weston to turn off the car and then "he reached in there [and] started ripping her out by her head," eventually getting her out of the car and slamming her to the ground multiple times. Johnson said she was scared and called her mother and 911 and put both phones on speakerphone.

{¶27} Johnson testified that Mulligan then asked her to get off of the phone and to get out of the car, and she finally agreed to do so, but then Mulligan opened the door and grabbed her by the hair, ripping her wig off in the process, forcibly pulling her out of the car and damaging the seat belt. At this point, both officers began to hit her; Mercer punched her in her mouth, causing it to bleed. Mercer continued to punch her while

Mulligan hit her in the back, and she was kneed in the stomach several times, ultimately falling to the ground. Johnson claimed she never started swinging at the officers. After the incident, more officers and an ambulance arrived; Johnson testified that Mercer would not allow her to be taken to the hospital.

{¶28} Johnson further testified that in 2009, Mulligan, Mercer, and another officer were involved in an incident with her then twelve-year-old son. She explained that Mulligan had a gun pointed at her son's head and performed a search where Mercer "went down the crack of his butt to his groin and searched him." She said she attempted to open an internal affairs investigation against the officers; however, nothing came of it.

{¶29} On cross, Johnson agreed that the 911 recording made no mention of Weston being slammed to the ground and that there was no screaming in the background. Johnson was presented with the Rural Metro ambulance report—which she acknowledged she signed—stating that she refused to be taken to a hospital. She also admitted, without being asked, that she has driven without a license many times.

{¶30} Weston testified that she drove Johnson to get lottery tickets and then returned to Youngstown, and because Johnson was not feeling well, she planned to take Johnson to the hospital, but was driving home first to retrieve a magazine when she was pulled over. She had noticed a vehicle following her, and originally thought it was a taxi, not an unmarked police vehicle. She maintained that she properly used her turn signal, and was unaware of any issue with her driver's license on the date of the incident.

{¶31} Weston continued that when she pulled over, Mercer told her she failed to use her signal and asked for identification, and that she offered to provide other identification because she did not have her driver's license with her. Mercer then told her to turn off the car and get out, but before she could get out of the car, Mercer grabbed her by the arm and side of the head and pulled her from the car. Mercer then slammed her on the ground about seven times, causing her right cheek to hit the ground. On cross, she later conceded that her face did not bleed and the photograph of her after the incident revealed no marks.

{¶32} Weston further testified that Mercer then "slammed [her] on the top of his car and he started going down [her] pants searching [her];" that she was screaming to

Johnson who was still in the car; and Mercer threw her into the police car. She then saw the officers "beating" Johnson and got out of the police car to protest the officers' treatment of Johnson. She did not see Johnson fighting back, but conceded she did not see the beginning of the struggle; she only started watching after Johnson was out of the car and on the ground. When Mercer saw her get out of the police vehicle, he responded by slamming her on the ground two more times and then kneed her in the back. She looked up to see Marietta Wilson standing at her front door observing the incident, and it appeared Wilson was attempting to record the event with her cell phone.

{¶33} Finally, Weston asserted that the photograph of her after the incident where she is smiling was not a happy picture but really a picture of her feeling humiliated and embarrassed.

{¶34} Marietta Wilson, who lived near to where the incident occurred, testified that she heard a commotion outside and opened her front door to see what was happening. She saw Mercer leading a handcuffed Weston to the police cruiser. Wilson heard Mulligan politely ask Johnson to put down the phone and get out of the vehicle, and Johnson asking why she needed to get out, protesting that she had done nothing wrong. The passenger door then came open, although Wilson did not see how, and then she saw Mercer return, grab Johnson, and hit her one time in the stomach; the officers did not hit Johnson once she was on the ground.

{¶35} Wilson further testified she saw Weston come out of the cruiser and start yelling at the officers, protesting that Johnson was sick and not to treat her that way. In response, Mercer cursed at Weston and told her to get back in the cruiser. At that point, Wilson said she started trying to take pictures. She then saw Weston on the ground, but did not see how she got there, and then saw Mercer put Weston back in the cruiser and returned to Johnson, who was on the ground. During the incident she never saw either woman attempt to fight with the officers. Wilson also observed Johnson start to walk towards an ambulance, but officers turned her around and put her into a squad car.

{¶36} On cross, Wilson testified that she never saw Mercer body-slam Weston onto the cruiser, nor did she see him put his hands up Weston's shirt or down her pants, which contradicted Weston's testimony. In fact, she said she never saw any violence

towards Weston; and that when Mercer escorted Weston back into the police car, he did so in a non-violent manner. She agreed that when initially asking Johnson to exit the car and put down her phone, Mulligan did so politely. Further, Wilson conceded she did not see the beginning of the incident between Johnson and Mulligan that led to Mercer punching Johnson, nor did she observe who opened the door, or how Johnson got out of the car. Wilson further testified on cross that Mulligan never struck Johnson, which contradicted Johnson's testimony; she agreed that Johnson was resisting arrest.

{¶37} A number of joint exhibits were admitted into evidence: Johnson's outstanding warrant; a recording of Johnson's 911 call; photographs of the defendants and the officers; and Weston's BMV record. In addition, admitted into evidence were: Johnson's Rural Metro ambulance report; several photographs of Johnson, one depicting the cut on her lip; and a photograph of Wilson's house showing her vantage point of the incident. During closing arguments there were no objections to anything said by the prosecutor.

{¶38} After considering all the evidence, the jury found Weston guilty of obstructing official business and driving under suspension. A mistrial was declared on the resisting arrest charge because the jury failed to reach a unanimous verdict.[3] Following a sentencing hearing, Weston was sentenced to, inter alia, 30 days for obstructing official business and one day for driving under suspension, and granted a stay pending appeal.

## Vindictive Prosecution

{¶39} Before we address the substance of this assignment of error, a glaring misstatement in the record must be clarified, which requires us to invoke the principle of judicial notice. Specifically, what date did Johnson and Weston file a civil rights action against the officers and the City relative to the re-filed charges? While the latter date is clear from the record, the former is not. As noted above with respect to the missing 911 tape, the appellant is responsible for the record on appeal. And as will be discussed below, Johnson and Weston bear the burden of proof with respect to this claim.

---

[3] Johnson was convicted of two counts of assault, one against Mercer and one against Mulligan, obstructing official business and resisting arrest. Johnson was sentenced to, inter alia, 30 days for obstructing official business, 120 days for each assault count, and 60 day for resisting arrest, to be served consecutively, for an aggregate jail term of 330 days.

**{¶40}** As noted above, the joint motion filed by Weston and Johnson with the trial court seeking to dismiss the new charges on the grounds of prosecutorial vindictiveness was replete with typographical errors, which were repeated on appeal. Johnson represents in her brief on appeal that "immediately prior to the charges being refiled, the Appellant had initiated a civil rights action against the officers and the City of Youngstown." Similarly, Weston's appellate brief asserts that "In the interim, Ms. Weston filed a suit for police brutality under the Civil Rights Act." However, the precise dates are unclear and even the State's briefs on appeal contain multiple typographical errors regarding the dates.

**{¶41}** Thus we invoke the principle of judicial notice. Evid.R. 201 Judicial notice of adjudicative facts, provides in pertinent part:

> (B) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> (C) When discretionary. A court may take judicial notice, whether requested or not.

**{¶42}** This rule has been interpreted by the Ohio Supreme Court as permitting a court to sua sponte take judicial notice of certain relevant facts. *Disciplinary Counsel v. Sargeant*, 118 Ohio St.3d 322, 2008-Ohio-2330, 889 N.E.2d 96, ¶22; *Pankey v. Court of Common Pleas*, 7th Dist. No. 11 MA 29, 2011-Ohio-4258 (taking judicial notice of docket entries of subsequent filings in a common pleas declaratory judgment action, which was the subject of a mandamus action before the court of appeals). "A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' " *State ex rel. Coles v. Granville,* 116 Ohio St.3d 231, 2007-Ohio-6057, 877 N.E.2d 968, ¶20 (internal citations omitted).

**{¶43}** The record reveals that the incident occurred on March 30, 2011; the original charges were filed on March 31, 2011; and the charges were re-filed on March

15, 2012. We take judicial notice from the following court docket entries: 1) the federal civil rights action was filed in the Mahoning County Court of Common Pleas on March 29, 2012, in a case styled *Desiree Johnson and Doretha Weston v. City of Youngstown, Ohio, et. al.,* Case No. 12 CV 956; 2) the defendants filed a notice of removal to federal court on May 8, 2012; and 3) the case was filed May 8, 2012 in the U.S. District Court for the Northern District of Ohio, Eastern Division under Case No. 4:2012 CV 01137.

**{¶44}** Thus, the §1983 action filed by Weston and Johnson against the City and the officers was filed two weeks *after* the charges were re-filed against them.

**{¶45}** In her first of two assignments of error, Weston asserts:

**{¶46}** "The trial court erred in declining to dismiss this cause on grounds of vindictive prosecution because the state failed to offer any evidence to rebut a presumption of vindictiveness."

**{¶47}** Weston asserts that the State re-filed charges against her in retaliation for her filing a jury demand and a §1983 lawsuit, claiming the procedural history and sequence of events suggest a reasonable likelihood of vindictiveness; thus creating a presumption of vindictiveness which the State has failed to rebut. *See Thigpen v. Roberts*, 468 U.S. 27, 30, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984); *Blackledge v. Perry*, 417 U.S. 21, 27-28, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). Protection of criminal defendants from vindictive prosecution is rooted in the Due Process Clause. *See Thigpen; Blackledge.*

**{¶48}** As the §1983 action arising out of this incident was filed after she was re-charged, Weston's argument is limited to the effect of her jury demand on the State's decision to re-file the charges.

**{¶49}** Although there are no cases from the Ohio Supreme Court or this court discussing vindictive prosecution, the United States Supreme Court has held that where the State brings additional or more serious charges that subject a defendant to an increased punishment following the successful appeal of his conviction, a rebuttable presumption of vindictive prosecution attaches. *Thigpen; Blackledge.*

> To punish a person because he has done what the law plainly allows him to
> do is a due process violation "of the most basic sort." *Bordenkircher v.*

*Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604. In a series of cases beginning with *North Carolina v. Pearce* [395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656] and culminating in *Bordenkircher v. Hayes*, the Court has recognized this basic—and itself uncontroversial—principle. For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.

*United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982).

**{¶50}** However, the Supreme Court specifically declined to extend the presumption of vindictiveness to the pretrial context, *Goodwin* at 381, reasoning that "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." *Goodwin*, 457 U.S. 368 at 382.

In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins-and certainly by the time a conviction has been obtained-it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor. Defense counsel routinely file pretrial motions[.] * * * It is unrealistic to assume that a

prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

*Goodwin* at 381.

**{¶51}** In situations where no presumption of vindictiveness arises, "the burden lies with the defendant to 'prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do.' " *State v. Wilson*, 47 Ohio App.3d 136, 140, 547 N.E.2d 1185 (8th Dist.1988) citing *Goodwin*. In other words, in such situations, generally the defendant must put forth evidence of an actual vindictive motive by the prosecution. *Id.* In a later case the Eighth District elaborated:

> As long as a prosecutor has probable cause to believe that an accused committed an offense, the decision whether or not to prosecute and on what charges is completely within the prosecutor's discretion. Thus, in a pretrial setting, a prosecutor is free to seek indictment on whatever charges the evidence can support, and no presumption of vindictiveness will attach if the defendant was clearly subject to those charges at the outset. Consequently, a pretrial decision altering the charges is less likely to be improperly motivated than a change in the charges made after an initial trial.

(Footnote citations omitted). *State* v. *Semenchuk*, 122 Ohio App.3d 30, 38, 701 N.E.2d 19, 24 (8th Dist.1997), citing *Goodwin* and *Wilson*.

**{¶52}** The case cited by Weston, *State v. Bradley*, 2d Dist. No. 06CA31, 2007-Ohio-6583, is distinguishable because it involved re-indictment following a successful appeal. Here, the charges were re-filed before trial commenced in these proceedings, and further, before the §1983 action based upon the instant offenses was filed. Thus, pursuant to *Goodwin*, no presumption of vindictiveness arises. Further, there is no evidence of a vindictive motive by the prosecutor. To the contrary, those involved in the

decision to re-file charges all denied that there was any connection between the defendants' exercise of a protected right and the re-filing of the charges, which at that point in time was Weston's jury demand, and Weston failed to meet her burden of proof and present evidence otherwise.

{¶53} Consistent with the reasoning in *Semenchuk*, from the outset Weston was subject to misdemeanor driving under suspension and resisting arrest charges, as there was probable cause for both offenses. Thus there can be no presumption of vindictiveness for the charges re-filed against Weston on March 15, 2012, based upon her demand for a jury trial. Accordingly, the trial court properly overruled Weston's motion to dismiss for vindictive prosecution, and Weston's first assignment of error is meritless.

### Plain Error in Closing Arguments

{¶54} In her second and final assignment of error, Weston asserts:

{¶55} "The trial court erred plainly in allowing a closing argument that maligned Ms. Weston for bringing a civil rights action relative to her arrest."

{¶56} Weston argues that certain comments made by the prosecutor during closing arguments were improper and prejudicial so as to require a new trial. As Weston concedes, because she failed to object to the alleged prosecutorial misconduct, she waives all but plain error. *State v. Kelley*, 179 Ohio App.3d 666, 2008-Ohio-6598, 903 N.E.2d 365, ¶83, citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶126. Thus, to "reverse her conviction, this court must be persuaded that the prosecutor's statements were not only improper, but that [Weston] would not have been convicted but for the improper comments." *Kelley* at ¶83, citing Crim.R. 52(B); *State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999).

{¶57} As this court has explained:

Parties have wide latitude in their closing statements, particularly "latitude as to what the evidence has shown and what inferences can be drawn from the evidence." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 213. A prosecutor may state his opinion if it is based on the evidence presented at trial. Id. A prosecutor may not state his personal belief regarding the credibility of a witness. *State v. Jackson*, 107 Ohio

St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 117. However, a prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 116. A prosecutor may even point out a lack of credibility of a witness, if the record supports such a claim. See *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, at ¶ 45.

*State v. Wolff*, 7th Dist. No. 07 MA 166, 2009-Ohio-7085, ¶13.

{¶58} On the other hand, a prosecutor "may not make excessively emotional arguments tending to inflame the jury's sensibilities." *State v. Tibbetts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001). Prosecutors may not deliberately saturate trials with emotion and a conviction based solely on the inflammation of fears and passions, rather than proof of guilt. *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993).

{¶59} Weston alleges that two statements made by the prosecutor constitute plain error. First, during his initial closing statement, the prosecutor said:

[T]hey want you to find them not guilty and they indicated they want to sue the officers and that's what this is about. They want to be able to sue the City, make some money, that's what this is about, that's what this case is about.

{¶60} Later in the prosecutor's rebuttal he stated:

[I]f you find them not guilty they are going to sue these officers. They are going to win a big lawsuit. Of course, they are going to have this. They have the burden. They would want this stuff so they can win millions of dollars. They are banking on you to find them not guilty so they can win millions of dollars. They want you to buy their story. That's what this is all about. They want you to be that gullible. No doctor, no emergency room doctor, Rural Metro ain't (sic) going to give them what they want because nobody is going to lose their license. That's what they want you to do is say not guilty, ha-ha, the jury believed us, now we can show this and we are going to sue

them and look at this we got millions of dollars from the City of Youngstown.

**{¶61}** In essence, the prosecutor was suggesting to jurors that they had a civic duty to convict, which is improper.  *See e.g., State v. Hopkins*, 7th Dist. No. 94 C.A. 103, 1996 WL 146099, *2 (Mar. 27, 1996) (concluding prosecutor's comments urging the jury to convict because it was their civic duty to reduce crime in the community were improper, but ultimately finding no prejudice.)

**{¶62}** However, the prosecutor's comments in this case do not rise to the level of plain error.  We cannot conclude that but for the alleged errors, the outcome of the trial would have been different.  There is considerable evidence demonstrating Weston's guilt on both counts.

**{¶63}** With regard to driving under suspension, Y.C.O. 335.07(a) provides:

No person whose driver's or commercial driver's license or permit or nonresident operating privilege has been suspended under any provision of the Ohio Revised Code, other than Ohio R.C. Chapter 4509, or under any applicable law in any other jurisdiction in which the person's license or permit was issued shall operate any motor vehicle upon the public roads and highways or upon any public or private property used by the public for purposes of vehicular travel or parking within this Municipality during the period of suspension unless the person is granted limited driving privileges and is operating the vehicle in accordance with the terms of the limited driving privileges.

**{¶64}** BMV official Jones testified that Weston's license was suspended on the day of the incident, and supporting documentation was admitted into evidence.  There is no dispute that Weston was driving that day; she herself admitted to it.

**{¶65}** With regard to obstructing official business, R.C. 2921.31(A) provides: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of

the public official's lawful duties."

{¶66} Mulligan testified that Weston was uncooperative in providing identification and then refused to get out of the vehicle when Mercer asked her, instead, she grabbed onto the steering wheel. Mercer then grabbed Weston's arm to extract her from the vehicle and she continued to refuse to get out, locking herself tighter around the steering wheel. Mercer then extracted Weston from the vehicle by pulling her out forcibly and that after Mercer pulled Weston out of the vehicle, Weston went to the ground and started flailing her arms for about 20 seconds to prevent being handcuffed.

{¶67} Weston contests Mulligan's account, asserting that she was beaten severely by Mercer without justification. However, her version of events is contradicted by lack of any evidence of visible physical injury from the altercation. Weston conceded that a photograph taken of her after the incident showed no bruising or other marks, despite her testimony that she was slammed multiple times on the cruiser and ground.

{¶68} Moreover, after being placed in the police cruiser, Weston attempted to interfere with the officers while they were trying to subdue Johnson. Weston got out of the cruiser to protest the officers' actions, which required Mercer to divert his attention from Johnson, who was resisting arrest, and escort Weston back to the cruiser. This subsequent conduct by Weston also constitutes obstructing official business. Accordingly, Weston's second assignment of error is meritless.

## Conclusion

{¶69} Both of Weston's assignments of error are meritless. A presumption of vindictive prosecution was not established; the prosecutor exercised his discretion to file misdemeanor driving under suspension and resisting arrest charges against Weston, which she was subject to from the outset. And while some of the prosecutor's comments during closing were improper, they did not rise to the level of plain error. Accordingly, the judgment of the trial court is affirmed.

Donofrio, J., concurs.
Vukovich, J., concurs.