[Cite as *State v. Shine-Johnson*, 2018-Ohio-3347.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-194 |
| v. | : | (C.P.C. No. 15CR-4596) |
| Joseph T. Shine-Johnson, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 21, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton*.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant. **Argued:** *George M. Schumann*.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Joseph T. Shine-Johnson, appeals a decision of the Franklin County Court of Common Pleas convicting him of murder and tampering with evidence. For the following reasons, we affirm the judgment of the trial court.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On September 18, 2015, a Franklin County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01; one count of murder, in violation of R.C. 2903.02; and one count of tampering with evidence, in violation of R.C. 2921.12(A), arising from the fatal shooting of appellant's father, Joseph Bythewood ("Joe"). Each count included an associated firearm specification pursuant to R.C 2941.145(A). Appellant entered a plea of not guilty, and the case proceeded to a jury trial

where appellant argued he shot his father in self-defense. A summary of relevant evidence adduced at trial follows.

{¶ 3} In May 2015, Joe and his girlfriend, Maureen Quinn, moved into a house with their daughter, Alexis, and Maureen's minor son. Joe and Maureen also allowed appellant, Joe's son from his prior marriage to Lauren Shine, to live in the basement of the house. Lauren lived near Joe and Maureen's house. Appellant had lived in Lauren's house previously and still had belongings there.

{¶ 4} Maureen owed appellant money because he paid to have one of her cars released from the impound lot. On the day of the shooting, September 10, 2015, appellant posted a social media update referencing money and stating "just don't play with me love or me money, that's when it becomes tombstone" and posting a "meme" with text which read, "[w]atch who you're being loyal too [sic], don't fuck around and make an ass out of yourself doing all the right shit for the wrong motherfucker." (Tr. Vol. 5 at 946; Tr. Vol. 4 at 789; State's Ex. 115.) Alexis saw the post and believed appellant was upset about Maureen not repaying him. Appellant testified the comment was a quote from a line in the movie *Tombstone* and was "[j]ust a random post. It's dealing with the situation. I mean, it's just [a] random quote." (Tr. Vol. 4 at 787.) He denied it was posted in regard to the conflict he had with Maureen, denied it was a threat at all, and testified that he could not see how it could be considered a threat.

{¶ 5} Maureen testified that on the day of the shooting, the air conditioner was not working so she attempted to go to the basement where the fuses were located. She found the stairs blocked with ropes, screwdrivers, and at least one knife, and saw a bucket of water with some sort of battery charger plugged in nearby at the bottom of the stairs. Fearing she may be injured, Maureen opted not to go downstairs and told Joe about the situation. Appellant denied he had "booby-trapped" the basement. (Tr. Vol. 5 at 993.)

{¶ 6} Appellant got a ride to work that day with Barbara Dick, a friend from work who lived nearby. Barbara did not notice anything unusual about appellant. After work, appellant watched a movie with Barbara at her house. Appellant testified that while he was watching the movie he had an argument, via text, with Maureen about repayment of the money she owed him, which ultimately resulted in Maureen texting him "don't text me, don't talk to me anymore, leave me alone, talk to your dad." (Tr. Vol. 4 at 800.)

According to appellant, he nearly immediately also received a text from Joe saying "bring your ass home." (Tr. Vol. 4 at 806.) He told Barbara that "things are getting bad" and that he had to go home to handle a family issue. (Tr. Vol. 4 at 806.) Appellant knew Joe had a short temper and could get violent, which was a concern for him, but he testified that he did not expect he would be assaulted when he got home and was not looking to harm his father.

{¶ 7} According to Barbara, near the end of the movie, appellant received a text and told Barbara he needed to go home immediately and that "it wasn't going to end well." (Tr. Vol. 3 at 453.) Barbara noted appellant's mood completely changed, like a "bulb just flashed right off," and he seemed sad and quiet. (Tr. Vol. 3 at 454.) Barbara drove appellant home; during the drive, Barbara asked appellant if everything was okay and again appellant stated "it wasn't going to end well." (Tr. Vol. 3 at 454.) Appellant asked Barbara to pull into the driveway to the right of the house, and she stopped just short of the end of the house. Appellant asked her if she would stay there because, according to appellant, he was worried about what would happen and had a "gut feeling that there was going to be an argument." (Tr. Vol. 4 at 817.) Barbara did wait in the car once appellant exited and began to read a book.

{¶ 8} Inside the house, Maureen testified that after dinner and watching a movie in the living room with her kids, she started up the stairs leading to the second floor bedrooms and heard a loud noise that she described as a "[d]oor slam, things getting thrown" from the kitchen area. (Tr. Vol. 2 at 190.) She continued upstairs, then heard Joe and appellant arguing, both sounding "very aggravated and mad." (Tr. Vol. 2 at 194.) She heard "get out of my face," appellant yelling about her and money for the impound charge, and them running up and down the basement steps. (Tr. Vol. 2 at 195.) Maureen thought the argument lasted about 10 or 15 minutes; she stayed upstairs in order to try to calm her son and the dogs down until the argument escalated to the point that she told her kids to call 911, and she proceeded down the stairs. At that point, she saw the two men arguing near the basement door, then appellant said he was leaving and walked out the back kitchen door with Joe behind him in the kitchen; Maureen did not see anything in Joe's hands. According to Maureen, Joe was in the process of closing and locking the back door when appellant kicked it back in. The door flew open. Joe lost his footing and

then turned around to face outside of the door. Maureen heard Joe ask "so you're just going to shoot your dad?" and appellant responded "[y]ep," followed by a gunshot. (Tr. Vol. 2 at 207.)

{¶ 9} Maureen testified she shut the back door and dead-bolted it. As she turned around, another gunshot came through the glass of the back door, and glass struck her in the back of the head. She yelled "I got hit" but then realized she was not bleeding and diverted her attention back to Joe, who was asking her for help. (Tr. Vol. 2 at 208.) She ran upstairs to get her cell phone to call 911. When she came back downstairs, Joe had pulled himself to the living room. Both Maureen and her daughter were on the phone with 911 and attempting to apply pressure on his wounds.

{¶ 10} Maureen, on cross-examination, remembered telling the police she could not say at what point appellant had a gun because they were going from downstairs to outside as she was dealing with her son and dogs upstairs. She also agreed she told the police that she did not remember the color of appellant's shirt because she really did not see him. On redirect, Maureen confirmed that although she was upstairs dealing with the dogs and her son during the argument, she came downstairs and witnessed the critical moment of Joe standing in the doorway and suffering the gunshot.

{¶ 11} Alexis testified that on the day of the shooting, when she came home from work the 20-gauge shotgun, which she knew did not work and which was usually stored in the closet, was lying on the couch. Later that evening, she was upstairs with her mom when she heard appellant come into the house and the sounds of things slamming. She heard her dad ask appellant if he was okay and then the two of them arguing about money in the kitchen. When Alexis briefly came down stairs to get her dog, she did not see her dad with any weapons or threatening appellant. She returned upstairs to her bedroom, put the dog down, and heard a gunshot from outside below her bedroom window. She heard both her mom and dad screaming, went downstairs, and called 911. The 911 call was played for the jury and admitted into evidence.

{¶ 12} Sheena Bythewood, Joe's niece, testified that she came over after the shooting while the police were still present. She testified that both Maureen and Alexis, speaking with her together, told her Joe had the 20-gauge in his pant leg all day waiting for appellant to come home. On cross-examination, Sheena testified Alexis must be lying

in testifying that she and Maureen were put in the back of separate police cruisers before she arrived and that Alexis was permitted to hug Sheena and get back in the cruiser. She testified she had no knowledge that everyone was at work and not with Joe throughout the day. Finally, she agreed that she talked with appellant "all the time." (Tr. Vol. 4 at 726.)

{¶ 13} According to appellant, once he was inside the house, Joe began yelling at him saying that appellant had accused everyone of stealing from him. Joe pushed him in the kitchen and again on the stairs to the basement. In the basement, appellant testified that Joe kicked things, threw stuff around, picked up a telescope and swung it at appellant's head, which appellant dodged, and carried the telescope into the kitchen. Alexis later saw the telescope and a large pot, usually kept in the basement, were in the kitchen.

{¶ 14} Both men proceeded upstairs again. Appellant testified he wanted to leave at that point, but Joe accused appellant of threatening Maureen on social media and stated they did not owe appellant money because he had not paid rent. When Joe said the loan would not be repaid, appellant said he would sue Maureen. According to appellant, this made Joe "very angry," and Joe picked up a knife that was on the table and said "I'm gonna fuck you up." (Tr. Vol. 4 at 826, 827.) Appellant thought Joe was going to stab him, but, according to appellant, Joe set the knife back down, retrieved a 20-gauge shotgun from under a blanket on the couch, pressed it in appellant's face and chest, and called appellant a "punk mother fucker." (Tr. Vol. 4 at 827.) Joe backed appellant into the kitchen with the gun aimed at appellant at close range. Appellant testified he began to fear for his life and thought Joe was going to shoot him. Appellant panicked and ran to the basement because Joe was blocking the back door. He could not call the police because his cell phone was "dead" and was still charging, and there was no land line. (Tr. Vol. 4 at 833.)

{¶ 15} Appellant testified he got a 12-gauge shotgun from the basement and went back upstairs to try to flee. According to appellant, no one but Joe was present. Joe aimed the 20-gauge shotgun at appellant. Appellant asked "you're going to shoot me?" and took off running toward the back door. (Tr. Vol. 4 at 836.) Joe followed, and as appellant got the back door open and tried to step onto the stairs, Joe hit him with the back of the

shotgun, causing appellant to miss several steps and stumble forward into the yard. Appellant turned around to see where Joe was and saw him standing in the doorway, as if he was going to step onto the porch, with the shotgun aimed in appellant's direction. According to appellant, he believed Joe was going to shoot him. Unable to "outrun a bullet" and with "nowhere for [him] to run," appellant fired his shotgun while it was still at hip level without having a chance to aim. (Tr. Vol. 4 at 841.) Joe jumped back, but appellant was unaware whether his first shot hit his father. Still perceiving a threat, he immediately fired a second shot as the back door was still open and then he chambered but did not fire another round. After he went away from the door, he heard someone scream "he shot my dad." (Tr. Vol. 4 at 844.) Appellant testified he walked away from the house to Barbara's car and then went to his mother's house and told her what happened. Not feeling safe there, he put the shotgun in his mother's basement on top of his suitcases, walked to his girlfriend's house, and then turned himself in to police.

{¶ 16} Barbara, still parked in her car in the driveway, heard arguing from inside the home that she believed lasted about three or four minutes. She could not see the back door itself but heard it open. According to Barbara, appellant, holding a shotgun, walked away from the house and into about the "middle or little bit past the middle" of the yard. (Tr. Vol. 3 at 461.) He then turned around, fired a shot leveled at the house, and fired a second shot in the air at an angle that Barbara thought would be high enough to go over the house. Appellant walked back toward Barbara's car, and she rolled down the window and asked him if he was all right. Appellant said "I shot him" and then he "took off running." (Tr. Vol. 3 at 463.) Barbara called 911 and stayed to speak with detectives.

{¶ 17} Paramedics and law enforcement arrived. Law enforcement noted a shotgun in the living room laying "far enough away that [the responding officers] were rather confident that [Joe] was not going to be able to reach it." (Tr. Vol. 2 at 93.) Maureen testified it had belonged to Joe's father and Joe inherited it, and it was common knowledge to the family, including appellant, the gun did not work. Appellant testified he believed it worked and that Joe kept ammunition for it in the house. A crime scene detective documenting evidence at the scene noted "possible blood" on the 20-gauge, and a forensic examination showed it was loaded with one live cartridge but inoperable due to a missing firing pin. (Tr. Vol. 3 at 545.) A forensic scientist with the Columbus Division

of Police Crime Laboratory testified that, when assembled, a person could not tell if the gun was operable by looking at it.

{¶ 18} Mark Butler testified that he was living with Lauren, appellant's mother, at the time of the shooting. Mark learned appellant had left a shotgun in the basement of his home. He used a towel to move the gun outside in the front yard and later called the police to report the discovery.

{¶ 19} Joe was pronounced dead at the hospital. According to the coroner's report, Joe died from a shotgun wound of the abdomen.

{¶ 20} On February 24, 2017, the jury returned a verdict of not guilty to the aggravated murder charge and guilty to the murder and tampering with evidence charges and associated specifications. The trial court sentenced him to a prison term of 19 years to life.

{¶ 21} Appellant filed a timely notice of appeal to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 22} Appellant presents eight assignments of error for our review:

[1.] The Defendant was denied his right to a fair trial under U.S. Const. Amend. V, VI, and XIV, and Ohio Const. Art I, §10 and 16because of prosecutorial error.

[2.] Plain error based on prosecutorial error denied the Defendant his right to a fair trial under U.S. Const. Amend. V, VI, and XIV, and Ohio Const. Art I, §10 and 16.

[3.] The trial court committed prejudicial error and denied the Defendant his right to a fair trial in violation of U.S. Const. Amend. V, VI, and XIV and Ohio Const. Art I, §10 and 16, when it failed to give curative instructions to the jury.

[4.] The trial court committed prejudicial error and denied the Defendant his right to a fair trial in violation of U.S. Const. Amend. V, VI, and XIV, and Ohio Const. Art I, §10 and 16when it refused to provide jurors with requested jury instructions.

[5.] Trial counsel rendered ineffective assistance in violation of the Defendant's rights under U.S. Const.

Amend. V, VI, and XIV, and Ohio Const. Art I, §10 and 16.

[6.] The trial court committed prejudicial error and denied the Defendant his right to a fair trial in violation of U.S. Const. Amend. V, VI, and XIV, and Ohio Const. Art I, §10 and 16due to the cumulative effect of evidentiary errors at trial.

[7.] The trial court erred in entering judgment of conviction for tampering with evidence with firearm specification because it was not supported by sufficient evidence.

[8.] The trial court erred in entering judgment of convictions for murder and tampering with evidence because they were against the manifest weight of the evidence.

## III. DISCUSSION

{¶ 23} For clarity of discussion, we will address appellant's assignments of error out of order.

### A. Jury Instructions (Fourth Assignment of Error)

{¶ 24} In his fourth assignment of error, appellant contends the trial court committed prejudicial error and denied him a fair trial when it refused to provide jurors with certain requested jury instructions. For the following reasons, we disagree.

{¶ 25} Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder. *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus; *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 6 (10th Dist.). A defendant in a criminal case is entitled only to have the law stated correctly by the trial court, not to have his proposed jury instructions presented to the jury. *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 48. Where requested jury instructions are correct statements of the law as applied to the facts of the case, they should generally be given. *Id.* A separate instruction is viewed in light of all the instructions as a whole. *State v. Price*, 60 Ohio St.2d 136 (1979), paragraph four of the syllabus.

{¶ 26} A court reviewing a trial court's refusal to submit to the jury a requested instruction must determine whether the trial court's decision constituted "an abuse of

discretion under the facts and circumstances of the case." *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). The term "abuse of discretion" connotes more than an error of judgment; rather, it implies that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

### 1. Cohabitant Instruction

{¶ 27} Appellant first challenges the trial court's rejection of his proposed instruction regarding cohabitants and the "no duty to retreat" rule as it relates to self-defense. (Appellant's Brief at 44.) The jury instruction at issue given by the court states:

> A person has a duty to retreat unless he is in his residence
> * * *.
>
> "Residence" means a dwelling in which a person lives.
>
> A "dwelling" means a building of any kind that has a roof over it and is designed to be occupied by people at night. A building includes an attached porch.

(February 24, 2017 Jury Instructions at 11.)

{¶ 28} Appellant objected to this instruction and requested an instruction that "there's no duty to retreat from one's own home before resorting to the use of force and self-defense against a cohabitant with an equal right to be in the home." (Tr. Vol. 4 at 896.) Appellant argues this instruction is relevant since appellant was a cohabitant with his father, was necessary to instruct the jury since he was assaulted inside the home prior to trying to escape through the backyard, was not redundant since the instructions given by the court did not address cohabitants, and was prejudicial since plaintiff-appellee, the State of Ohio, had elicited testimony that appellant was not on the lease, was not paying rent, and was not part of the original family unit, all of which implied he had a lesser right to be at the home. Appellant also suggests that additional instructions—that a defendant has to rule out all other means of escape before using force, could not violate any duty to retreat or avoid the danger, must not seek a fight armed with a dangerous weapon, and must withdraw from a fight he started—confused and contradicted the instruction regarding not retreating from one's own home.

{¶ 29} Appellee argues it is undisputed that at the time of the shooting, appellant was not in the house and that the only evidence before the jury was that appellant was

outside the house when he fired the shot that killed his father. As a result, appellee argues the cohabitant instruction would have been inappropriate.

{¶ 30} Under Ohio law, self-defense is an affirmative defense which a defendant must establish by a preponderance of the evidence. R.C. 2901.05(A); *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). To prove self-defense, a defendant must prove that he: (1) was not at fault in creating the situation that gave rise to the fight; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that the use of force was his only means of escape; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Williford*, 49 Ohio St.3d 247, 249 (1990), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus.

{¶ 31} Generally, one has a duty to retreat, if possible, before resorting to lethal force. *Williford* at 250. However, there is no duty to retreat from one's own home before using force in self-defense. *Hubbard* at ¶ 51; R.C. 2901.09(B) ("a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense"); *State v. Thomas*, 77 Ohio St.3d 323, 327 (1997) ("a person who, through no fault of her own, is assaulted in her home may stand her ground, meet force with force, and if necessary, kill her assailant, without any duty to retreat"). The Supreme Court of Ohio has further held that "there is no duty to retreat from one's own home before resorting to lethal force in self-defense against a cohabitant with an equal right to be in the home." *Id.* at 328.

{¶ 32} This court has found the "no duty to retreat" exception did not apply where "the evidence demonstrates the shooting occurred, at best, in appellant's front yard." *State v. McDowell*, 10th Dist. No. 10AP-509, 2011-Ohio-6815, ¶ 39, *discretionary appeal not allowed*, 131 Ohio St.3d 1512, 2012-Ohio-1710. This understanding aligns with the definitions set forth in Ohio's no duty to retreat statutes. As it is used in R.C. 2901.09(A), "residence" means "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest," and "dwelling" means "a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. [A] building or conveyance includes, but is not limited to, an attached porch, and a building or conveyance with a roof over it includes, but is not limited to, a tent." R.C. 2901.05(D)(2) and (3).

{¶ 33} Appellant has not cited cases in which, despite the definitions in R.C. 2901.05(D), the no duty to retreat exception extends to a similar factual situation to the case at hand, where, after an altercation with a cohabitant inside of the home, the defendant fires the fatal shot from the yard.  Considering all the above, we find appellant has not demonstrated that the trial court abused its discretion in declining to provide a jury instruction on the no duty to retreat rule extending to cohabitants or that the lack of such an instruction constitutes reversible error in this case.

### 2.  Unanimity Instruction

{¶ 34} Appellant next challenges the trial court's decision to not include his requested unanimity instruction.  Specifically, appellant requested an instruction stating that "[o]ne may not be convicted of the offense of Aggravated Murder or Murder if even one jury finds in favor of the accused's claim of self-defense."  (Feb. 20, 2017 Def.'s Proposed Instructions at 1.)  According to appellant, this is a correct statement of the law pursuant to *State v. Davis*, 8th Dist. No. 103906, 2016-Ohio-5630, ¶ 18, and the failure to give the instruction increased the probability of prejudice to appellant in light of the prosecutor's alleged misstatement of law that by raising self-defense appellant admitted murder and that appellee's burden of proof was therefore "done."  (Appellant's Brief at 46.)  Appellee counters that appellant's requested instruction was already apparent from the instructions given by the trial court.

{¶ 35} The relevant jury instructions given by the trial court stated, in pertinent part:

> If the defendant fails to establish self-defense, the State still must prove to you beyond a reasonable doubt all the elements of an offense before you can convict the defendant of that offense.
>
> * * *
>
> * * * Consult with one another.  Consider each other's views and deliberate with an objective of reaching an agreement if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself but you should do so only after discussion and consideration of the case with your fellow jurors. Do not hesitate to [] change an opinion if convinced that it is wrong.  However, you should not

> surrender your honest convictions in order to be congenial or to reach a verdict solely because of the opinion of other jurors.
>
> *Before you can find the defendant guilty, you must unanimously agree on the verdict.*

(Emphasis added.)  (Tr. Vol. 5 at 1210, 1217-18.)

{¶ 36} The *Davis* decision does not support reversal here.  The *Davis* court noted that "[i]n the normal situation based on the standard unanimity instruction, the jury's finding of guilt is an implicit rejection of the affirmative defense because the unanimity instruction requires the jury to act as one."  Id. at ¶ 22.  However, *Davis* was not "the normal situation." *Id.*  Rather, after the court gave a standard unanimity instruction, the jury inquired whether they must unanimously find that the defendant acted in self-defense, and the trial court gave a supplemental, erroneous instruction that essentially stated all jurors must find appellant guilty unless they unanimously accepted appellant's self-defense argument.  Jury polling showed at least one juror would have found the defendant not guilty based on an affirmative showing of self-defense.  With the record clear that there was no unanimous verdict in the case, the appellate court reversed and ordered a new trial.

{¶ 37} Unlike *Davis*, in this case, the trial court did not instruct the jurors that they all must find appellant guilty unless they unanimously accepted appellant's self-defense argument, and the record had no clear indication that a juror would have found appellant not guilty based on self-defense.  As noted by *Davis*, the standard unanimity instruction is generally sufficient, and the jury's finding of guilt is an implicit rejection of appellant's self-defense argument.

{¶ 38} Furthermore, we are unpersuaded by appellant's argument that the prosecutor's alleged misstatement of law during her closing argument regarding appellant admitting "murder" and therefore appellee's burden of proof being "done" added to the need for this requested jury instruction.  (Appellant's Brief at 39.)  As discussed in depth in the first assignment of error, below, the prosecutor's statement does not rise to the level of error when considered in the larger context of the closing argument.  The prosecutor repeatedly emphasized appellee had the burden to prove each element of the charged offenses beyond a reasonable doubt and was making the point appellant

admitted to purposeful killing, which, pursuant to R.C. 2903.02, is expressly defined as murder.

{¶ 39} Overall, we find the trial court did not abuse its discretion in declining to add appellant's requested unanimity instruction.

### 3. Character Evidence Instruction

{¶ 40} Appellant contends the trial court erred in not providing a limiting instruction pertaining to evidence admitted related to an allegation that appellant caused a younger, autistic stepbrother to seek treatment for a concussion in order to show his propensity for violence and which was unfairly prejudicial in violation of Evid.R. 403(A).

{¶ 41} "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request of a party, shall restrict the evidence to its proper scope and instruct the jury accordingly."  Evid.R. 105.  The rule on character evidence, Evid.R. 404, provides in pertinent part:

> (A) Character evidence generally.  Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:
>
> (1) Character of accused.  Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible * * *.
>
> * * *
>
> (3) Character of witness.  Evidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607 [Impeachment], 608 [Evidence of character and conduct of witness], and 609 [Impeachment by evidence of conviction of crime].
>
> (B) Other crimes, wrongs or acts.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶ 42} Proof of character may be made by testimony as to reputation, by testimony in the form of opinion, or, on cross-examination, by inquiry into a relevant specific instance of conduct under Evid.R 405(B). Thus, when a defendant introduces evidence of a particular character trait, usually peacefulness in a trial involving a violent offense, the defendant "opens the door" for the prosecution, which is then permitted to rebut or impeach this character evidence on cross-examination. (Internal citation omitted.) *State v. C.W.*, 10th Dist. No. 15AP-1024, 2018-Ohio-1479, ¶ 45; *State v. Warsame*, 10th Dist. No. 06AP-1254, 2007-Ohio-3656, ¶ 24. The cross-examination may include inquiry into relevant specific instances of conduct. Evid.R. 405(A).

{¶ 43} Here, appellee called Alexis on direct. Appellant, in cross-examining Alexis, asked whether she knew appellant to be a violent person and whether he was "one to go out and just try to cause harm to other people," which Alexis answered in the negative, and whether appellant tends to try to walk away from confrontation and tends to "bring the peace," which Alexis answered in the positive. (Tr. Vol. 3 at 416.) On redirect, appellee asked Alexis about her answers to these questions, followed by asking whether she knew of violence he committed and beginning to ask her to "[t]ell us about him and [his younger stepbrother], the concussion [the stepbrother] got." (Tr. Vol. 3 at 420.) Appellant objected and the parties conducted a voir dire examination of Alexis out of the presence of the jury. The court then disallowed appellee from questioning Alexis about the specific instance of violence because she did not have personal knowledge of the incident but allowed questioning regarding her awareness of situations in which he had gotten into fights generally. Appellee then resumed questioning of Alexis as follows:

> Q. Referring specifically to the questions [defense counsel] asked you about your brother's character trait for peacefulness, do you remember those questions?
>
> A. Yes.
>
> Q. It was your answer on cross-examination that you know your brother to be a peaceful man, correct?
>
> A. Yes.
>
> Q. But, in fact, you also know of more than one incident of where he did not act in a peaceful, peacemaker way, correct?

A. Yes.

Q. Okay.  And, in fact, you have direct knowledge of at least one of those incidents?

A. Yes.

(Tr. Vol. 3 at 438-39.)  Appellant denied being involved with any physical altercations with other members of his family.

{¶ 44} Our review of the transcript shows appellant introduced evidence of appellant's character trait of peacefulness, opening the door for appellee to rebut or impeach this evidence.  This is an exception to Evid.R. 404's prohibition against admitting evidence of a person's character or a trait of character for the purpose of proving action in conformity therewith on a particular occasion.  Evid.R. 404(A)(1).

{¶ 45} Moreover, the specific information that appellant deems prejudicial—the inference that appellant gave his young, autistic family member a concussion—was contained within the prosecutor's question.  The trial court instructed the jury that "[e]vidence is all the testimony received from the witnesses, the exhibits admitted during the trial, and facts agreed to by counsel call [sic] stipulations" and that "you must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered."  (Jury Instructions at 2, 3.)  Thus, the information was not "evidence" which would be subject to a limiting instruction, and the jury is presumed to follow the trial court's instructions.  *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 190.  We find the trial court did not abuse its discretion in declining to include a jury instruction regarding character evidence in these circumstances.

### 4.  Flight Instruction (Relevant to Tampering)

{¶ 46} Appellant contends the trial court abused its discretion in including a flight instruction in the jury instructions.  The instruction given by the trial court states:

> Testimony has been admitted indicating that the defendant fled the scene.  You are instructed that flight alone does not raise a presumption of guilt but it may tend to indicate the defendant's consciousness of guilt.  If you find that the facts do not support that the defendant's flight or if you find that some other motive prompted the defendant's conduct or if you are unable to decide what the defendant's motivation was then you should not consider this evidence for any purpose.  However, if you find that the facts support that the defendant

> engaged in such conduct, and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of a crime charged. You alone will determine what weight, if any, to give to this evidence.

(Jury Instructions at 1202-03.)

{¶ 47} Appellant objected to this instruction because the evidence showed he left the scene in fear of his safety and there was otherwise insufficient evidence to support the flight instruction. Appellant also asked the court to instruct the jury that it could consider the fact that appellant voluntarily surrendered. Appellee contends there was sufficient evidence to support a flight instruction.

{¶ 48} On this record, we agree with appellee. It is undisputed that appellant did not remain at the scene of the shooting but, instead, left the scene and proceeded on foot to his mother's house. He then left his mother's house and went to a second residence before deciding to turn himself in to the police. An inference could be drawn from this evidence that defendant fled the scene and continued to flee because of a consciousness of guilt. If the jury believed appellant's side of the story, the instructions specifically state the jury is free to decide that another motive, such as fear for his safety, prompted him to leave the scene. Furthermore, nothing in the flight instruction negated the jury's ability to consider the fact that appellant voluntarily surrendered. Therefore, we find the flight instruction was appropriate, and the trial court did not abuse its discretion in this regard.

{¶ 49} Overall, appellant has not demonstrated that the trial court erred or abused its discretion in relation to the jury instructions. Accordingly, we overrule appellant's fourth assignment of error.

## B. Sufficiency of the Evidence for Tampering Conviction (Seventh Assignment of Error)

{¶ 50} Under his seventh assignment of error, appellant contends his conviction for tampering with evidence with a firearm specification is not supported by sufficient evidence. We disagree.

{¶ 51} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state

proved beyond a reasonable doubt all the essential elements of the crime. *State v. Wilks*, ___ Ohio St.3d ___, 2018-Ohio-1562, ¶ 156. "[W]itness credibility is not a proper matter on review of the sufficiency of the evidence." *Id.* at ¶ 162.

{¶ 52} For the tampering with evidence charge, appellee had the burden to prove that appellant, "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, * * * alter[ed], destroy[ed], conceal[ed], or remove[d] any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1).

{¶ 53} Appellant argues there was insufficient evidence to show that he specifically intended to conceal the 12-gauge to avoid discovery. He points to evidence that he went to Lauren's house because he was traumatized, told his family what he had done, and put the 12-gauge with some of his things in the basement "for safety." (Appellant's Brief at 56.)

{¶ 54} Appellant points to evidence supporting his version of events. However, record evidence is present that, if believed, supports appellant's conviction. Appellant, having fired shots into a house, would know a police investigation would likely be instituted. It is undisputed that appellant did not leave the gun at the scene of the shooting but, instead, took the gun to his mother's house and ultimately left it in the basement. Police recovered the gun after Mark called 911 to report his discovery of the gun in the basement. Having viewed the evidence in the light most favorable to appellee, we find a rational trier of fact could have found that appellee proved beyond a reasonable doubt all the essential elements of tampering with evidence.

{¶ 55} Regarding the firearm specification, appellee was required to prove that appellant, while committing the underlying offense of tampering with evidence, had a firearm on or about his person or under his control. R.C. 2941.141(A). Appellant essentially argues that he could not have simultaneously possessed the gun to support the specification while he "dispossessed" it or "removed it from his person" to support the tampering charge. (Appellant's Brief at 57.) In other words, appellant believes because he left the gun in the basement he did not possess and control a firearm at the point the tampering offense was complete.

{¶ 56} Appellant does not argue or provide legal authority that a tampering with evidence and an attendant firearm specification conviction can never co-exist. Rather, appellant argues, here, that commission of tampering with evidence was only committed on his dispossession of the gun in the basement. However, removal of the gun from his person in the basement is not the only operative fact in this case. As stated above, evidence is sufficient to support appellant removed the gun from the scene of the shooting with knowledge that an investigation is likely to be instituted and with purpose to impair its value or availability as evidence in such proceeding or investigation. R.C. 2921.12(A)(1). During this time, appellant had a firearm on or about his person or under his control. R.C. 2941.141(A). As such, we find appellee submitted sufficient evidence to support the attached firearm specification.

{¶ 57} Accordingly, we overrule appellant's seventh assignment of error.

### C. Manifest Weight of the Evidence for Murder and Tampering Convictions (Eighth Assignment of Error)

{¶ 58} Under his eighth assignment of error, appellant contends his convictions for murder and tampering with evidence is against the manifest weight of the evidence. We disagree.

{¶ 59} To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. *Wilks* at ¶ 168, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 60} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14, citing *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing

*State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55.  A jury, as finder of fact, may believe all, a part, or none of a witness's testimony.  *State v. Antill*, 176 Ohio St. 61, 67 (1964); *State v. Vargas*, 10th Dist. No. 10AP-952, 2012-Ohio-6368, ¶ 65.  "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds."  *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 61} In this case, appellee had the burden to prove beyond a reasonable doubt that appellant violated R.C. 2903.02, which states, in pertinent part, "[n]o person shall purposely cause the death of another."  R.C. 2903.02(A); R.C. 2901.05.  Self-defense is an affirmative defense which the accused has the burden to prove by a preponderance of the evidence.  R.C. 2901.05(A); *State v. Smith*, 10th Dist. No. 04AP-189, 2004-Ohio-6608, ¶ 16.  To establish self-defense through the use of deadly force, a defendant must prove: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) he must not have violated any duty to retreat or avoid the danger.  *Robbins*, 58 Ohio St.2d 74, at paragraph two of the syllabus.  A defendant may only use as much force as is reasonably necessary to repel the attack.  *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25, citing *State v. Jackson*, 22 Ohio St.3d 281 (1986).

{¶ 62} To support his manifest weight argument, appellant contends that he established self-defense and should have been acquitted on that basis.  Appellant suggests that Maureen, who he believes gave the only testimony countering his version of the fatal moment in the backyard, contradicted herself regarding whether she was actually upstairs at the time of the shooting.

{¶ 63} The evidence in this case shows appellant returned home to what he believed to be a family argument that would not end well, a belief emphasized by him requesting that his friend wait outside with the car.  It is apparent that a heated argument occurred between father and son within the residence they shared and that appellant retrieved a shotgun from the basement and left through the back door.  The jury then heard two versions of events at the point where appellant exited the home.

{¶ 64} According to Maureen, who testified that she returned downstairs when the argument escalated, Joe was unarmed and attempting to close and lock the back door when appellant kicked it in. After Joe regained his footing in the doorway, Maureen heard appellant reply that he was going to shoot his father followed by a gunshot. Conversely, according to appellant, Joe had threatened him with a telescope, a knife, and the 20-gauge shotgun inside of the home. While appellant was attempting to flee in fear for his life, Joe then hit appellant with the shotgun causing appellant to miss several stairs and stumble out into the yard. Appellant testified that when he turned around, Joe was standing in the doorway aiming in his direction, so, fearing for his life and with nowhere to run, appellant shot back at Joe and then almost immediately shot again because he still perceived a threat.

{¶ 65} We do not find the jury lost its way in believing Maureen over appellant. First, contrary to appellant's argument, our review of the transcript does not show that Maureen contradicted herself about whether she was upstairs at the time of the shooting. She testified she was upstairs until the argument escalated at which point she came downstairs. Her testimony regarding her statements to police shed some doubt as to how much of the argument in the kitchen she witnessed but does not show she told the police she was upstairs at the point of the gunshot. "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. The trier of fact is free to believe or disbelieve all or any of the testimony." (Citation omitted.) *State v. Williams*, 10th Dist. No. 08AP-719, 2009-Ohio-3237, ¶ 16. *See also State v. Banks*, 10th Dist. No. 09AP-13, 2009-Ohio-4383, ¶ 15 (concluding that the factfinder is free to resolve or discount alleged inconsistencies). Furthermore, Maureen's account is strengthened, rather than weakened, by Alexis's testimony. Alexis testified that she was upstairs with her mother at the start of the argument, but, after the gunshot, she heard both her mother and father screaming. Alexis also testified that she did not see her father with weapons when she briefly went downstairs to retrieve her dog.

{¶ 66} Second, appellant's version of events, a panicked episode where he ran for his life out of the kitchen, stumbled into the backyard after being hit with the shotgun, turned back toward the house and fired his gun without time to aim, and fired a second shot while still perceiving a threat, is belied by Barbara's account of appellant walking

with his back to the house to the middle or past the middle of the yard, turning and firing the gun, and walking to her car. Appellant's choice to then run away on foot, rather than to stay and explain to police how his father repeatedly assaulted him and aimed a gun at him, tends to indicate appellant's consciousness of guilt. Furthermore, appellant's repeated insistence that his social media post could not be perceived as a threat undermined his credibility.

{¶ 67} " '[W]here a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding * * * as being against the manifest weight of the evidence.' " *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26. "It is the province of the factfinder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony." *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 72. " 'The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.' " *Id.*, quoting *Williams* at ¶ 16. Based on the testimony of Barbara, Maureen, and Alexis, and appellant's diminished credibility, we cannot say the jury lost its way in rejecting appellant's testimony as to self-defense and in convicting defendant of murder.

{¶ 68} Lastly, regarding the tampering with evidence charge, appellee had the burden to prove that appellant, "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, * * * alter[ed], destroy[ed], conceal[ed], or remove[d] any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1).

{¶ 69} Appellant simply states that he left the gun at his mother's house for safety reasons and the trial court's finding that he left it there to purposely make it unavailable to police was against the weight of evidence. We find this statement inadequate to meet his burden of demonstrating error in relation to the weight of the evidence for the tampering with evidence conviction. *State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 11, citing App.R. 16(A)(7); *Hubbard*, 2013-Ohio-2735, at ¶ 34.

{¶ 70} This is not the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin*, 20 Ohio App.3d at 175. Given the strength of the direct and circumstantial evidence, we conclude the jury neither lost its way nor created a miscarriage of justice in convicting appellant of murder and tampering with evidence.

{¶ 71} Accordingly, we overrule appellant's eighth assignment of error.

### D.  Prosecutorial Misconduct (First Assignment of Error)

{¶ 72} In his first assignment of error, appellant contends that prosecutorial misconduct denied him of his right to a fair trial.  For the following reasons, we disagree.

{¶ 73} As stated in *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 162:

> To evaluate allegations of prosecutorial misconduct, we "must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected [the defendant's] substantial rights." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 121.  Because prosecutorial misconduct implicates due-process concerns, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).  We "will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even" absent the misconduct.  *LaMar* at ¶ 121.

### 1.  Misstatements of the Law

{¶ 74} "The prosecuting attorney does not instruct the jury on the law, the trial judge does." *State v. Palmer*, 7th Dist. No. 89-B-28 (Aug. 29, 1996).  However, a prosecuting attorney should not mislead the jury by either misstating the law or the facts. *State v. Crossty*, 12th Dist. No. CA2008-03-070, 2009-Ohio-2800, ¶ 45, citing *State v. Depew*, 38 Ohio St.3d 275, 288 (1988).

{¶ 75} Appellant first contends the prosecutor misstated the law of self-defense by improperly adding a "duty to avoid trouble" to appellant's burden of showing he was not at fault in creating the affray and implying appellant violated this duty by going home to a potential family argument.  (Appellant's Brief at 2.)  Appellant cites to the following portion of his cross-examination by appellee as the misstatement of law:

Q. A duty to avoid trouble. You know you're walking in to an [sic] fight, don't you?

[Objection, overruled]

* * *

Q. That's your testimony? You could go up there?

A. Yes.

Q. You could go up there and say, mom, dad is high again. I don't know what's going on. I'm crashing here tonight. That would have been absolutely fine, wouldn't it?

A. But at that point in time I'm not sure as of what is going on. So I would not have no idea what is going on until I actually get into the house.

Q. A duty to avoid.

[Objection, sustained as to the prosecutor's comment]

* * *

Q. You know there's a problem and you don't try to avoid that problem?

A. I did try to avoid the problem.

Q. By going to that problem. That's how you try to avoid the problem, by walking into that situation?

(Tr. Vol. 5 at 982, 984.)

{¶ 76} In *State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 12, this court stated:

> It is very well-established that, in order to successfully utilize the affirmative defense of self-defense in a case where a defendant used deadly force, such as the case here, the defendant must prove all three of the following: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of deadly force; and (3) he did not violate any duty to retreat or *avoid the danger*. *State v. Jackson*, 22

Ohio St.3d 281, 283, 22 Ohio B. 452, 490 N.E.2d 893 (1986);
*State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979),
paragraph two of the syllabus.

(Emphasis added.)

{¶ 77} Our review of the transcript shows the prosecutor was attempting to establish appellant chose to return home almost immediately after receiving a text from his father stating "bring your ass here" that admittedly caused him to worry, despite his prior testimony that his father was using drugs, became violent when angry, and was known to pull out guns, and despite the fact that appellant was welcome to stay in his mother's nearby home.  (Tr. Vol. 5 at 982.)  Appellant does not argue that a "duty to avoid" is an improper consideration altogether but, instead, essentially believes the prosecutor inappropriately suggested that because appellant returned home to a possible confrontation he was at fault in creating the situation giving rise to the affray—a separate self-defense requirement.

{¶ 78} Contrary to appellant's argument, the prosecutor did not expressly connect the duty to avoid trouble with the not-at-fault element and was instead pursuing a line of questioning directly regarding the duty to avoid the danger.  Furthermore, appellant cites no authority to support his claim it is erroneous or prejudicial error for the prosecutor to impliedly connect the duty to avoid trouble with the not-at-fault element.  To the contrary, this court has noted the multitude of cases in which facts showing a defendant who chooses to confront the victim with otherwise lawful actions support both the finding that the defendant was at fault in creating the situation giving rise to the affray and/or a finding that the defendant violated a duty to avoid danger or retreat.  *Ellis* at ¶ 16 (finding, based on a multitude of similar cases, "the jury could properly find appellant at fault and/or he did not comply with his duty to avoid danger because he chose to enter a place where he knew the victim and [his ex-girlfriend] would be despite knowing that a confrontation might ensue, he chose to stay in the store even after a confrontation ensued with [his ex-girlfriend], and he chose to follow the victim and [his ex-girlfriend] out of the store and engage in a further confrontation outside instead of staying inside the store or walking away from the volatile situation").  Therefore, we do not find the prosecutor's conduct to be improper.

{¶ 79} Finally, we note, although appellant does not allege the prosecutor misstated the law of duty to retreat from one's home, he argues that the prosecutorial error alleged here was "compounded by the fact that [appellant] did not have a duty to retreat from his own home." (Appellant's Brief at 17-18.) Pursuant to R.C. 2901.09(B), "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence." *See also Hubbard*, 2013-Ohio-2735, at ¶ 51 (stating that, contrary to the general rule that a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation, "[w]hen a person is attacked in their home, * * * they have no duty to retreat before using force in self-defense" pursuant to R.C. 2901.09(B)). The prosecutor's cited statement here did not concern appellant's duty or lack thereof to retreat from danger once inside his own home, and appellant does not cite to case law extending R.C. 2901.09(B) to a defendant's choice to return home to potential trouble. Therefore, we find appellant has not demonstrated error in this regard.

{¶ 80} Considering all the above, we do not find the prosecutor's statements regarding the "duty to avoid" to be improper.

{¶ 81} Appellant next contends the prosecutor misstated the law by stating during her closing argument that because appellant had raised self-defense he was "admitting murder" and so appellee's burden of proof on the murder count was "done." (Appellant's Brief at 18.) According to appellant, this statement implied that the burden of proof on the murder count was automatically met, and a juror may have signed a guilty verdict because of the prosecutor's misstatement of the law.

{¶ 82} Prosecutors are afforded considerable latitude in closing arguments. *State v. Dillon*, 10th Dist. No. 04AP-1211, 2005-Ohio-4124, ¶ 50, citing *State v. Ballew*, 76 Ohio St.3d 244, 255 (1996). A prosecutor's isolated comments are not to be taken out of context and given their most damaging meaning. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 94, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). Rather, an appellate court must review a closing argument in its entirety to determine whether prejudicial error occurred. *Id.*, citing *State v. Frazier*, 73 Ohio St.3d 323, 342 (1995). Moreover, "[i]n closing argument, a prosecutor may comment on ' "what the evidence has shown and what reasonable inferences may be drawn therefrom." ' " *Dillon* at ¶ 50,

quoting *State v. Lott*, 51 Ohio St.3d 160, 165 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970).

{¶ 83} "R.C. 2901.05requires the prosecution to prove beyond a reasonable doubt every element of a homicide offense as defined by statute, and does not require the defendant to disprove an essential element of this offense." *Martin*, 21 Ohio St.3d 91, at syllabus.  Thus, in this case, appellee had the burden to prove beyond a reasonable doubt that appellant violated R.C. 2903.02, which states in pertinent part, "[n]o person shall purposely cause the death of another[.] * * * Whoever violates this section is guilty of murder." R.C. 2903.02(A) and (D).

{¶ 84} A defendant must prove, by a preponderance of the evidence, the affirmative defense of self-defense.  *Id.* at syllabus; R.C. 2901.05(A).  Self-defense "admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability."  *Id.* at 94 ("Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged.").  *State v. Johnson*, 10th Dist. No. 06AP-878, 2007-Ohio-2792, ¶ 30 (finding that self-defense is not considered in a sufficiency argument, since, as an affirmative defense, it involves an excuse or justification for doing an otherwise illegal act).

{¶ 85} Here, in the portion of closing argument referenced by appellant, appellee stated:

> Reasonable doubt. Yeah, I've got to prove that he purposefully, with prior calculation and design, caused the death of Joe Bythewood, Jr., that it happened here in Franklin County and he's the one that did it. And I have to prove it to you beyond a reasonable doubt.
>
> But, ladies and gentlemen, by alleging self-defense he's saying, yeah, I did purposely cause the death of Joe Bythewood, Jr., which in the State of Ohio we call murder.
>
> Now, he would even want -- he admitted that, yeah, I did that when [defense counsel] asked him. But when I asked him the same question though, no, no, no, no. He's not saying it's an accident, though. He's not saying somehow it's a reckless act. It was a purposeful act. I had to do it because.

> So I would argue that on his defense, asserting self-defense --
> it doesn't relieve me of it, but logically by saying, I did it, but
> murder is -- murder is presumed before you -- you don't get
> to self-defense unless you're admitting murder. And in this
> case I would argue to you they are admitting murder.
>
> See, I've got to prove each and every element beyond a
> reasonable doubt, but in Count 2, that's done.

(Tr. Vol. 5 at 1185-86.)  Following this statement, the prosecutor went on to point out that "[t]hen you've got to look at all of the evidence bearing on self-defense" and to argue that appellant was not justified in killing his father in the circumstances based on the testimony presented.  (Tr. Vol. 5 at 1188.)

{¶ 86} At the end of the closing statement, appellant objected, arguing that it was incorrect to tell the jury that in asserting self-defense appellant was admitting murder, because murder is a purposeful killing without justification and all appellant was admitting to is a purposeful killing. Because the objection was not made contemporaneously, the trial court declined to decide whether the closing remarks were in error or to instruct the jury on the point.

{¶ 87} At the outset, we note appellant has not cited cases in support of such a statement rising to the level of prosecutorial error.  Our review of the prosecutor's statement shows the prosecutor repeatedly emphasized appellee had the burden to prove each element of the charged offenses beyond a reasonable doubt and was making the point the appellant admitted to purposeful killing, which, pursuant to R.C. 2903.02, is defined as "murder."  The prosecutor then went on to discuss self-defense and her argument as to why the evidence shows appellant was not justified in killing his father. Looking at the prosecutor's statement in the larger context of the closing argument, we find the prosecutor's statement does not rise to the level of error.

### 2. Assertion of Personal Opinion on Appellant's Guilt During Opening and Closing Arguments

{¶ 88} A prosecutor generally may not express his personal belief or opinion as to credibility of a witness or as to the guilt of the accused. *Crossty*, 2009-Ohio-2800, at ¶ 45. However, a prosecutor may comment on the testimony and suggest the conclusions to be drawn from it.  *Id.*; *Oteng*, 2015-Ohio-1231, at ¶ 83.  In doing so, the prosecutor may express his or her personal opinion if he bases that opinion on the evidence presented in

court. *State v. Belmonte*, 10th Dist. No. 10AP-373, 2011-Ohio-1334, ¶ 31; *State v. Keenan*, 66 Ohio St.3d 402, 408 (1993). *See, e.g., Thompson*, 2014-Ohio-4751, at ¶ 193 (finding "nothing improper" about the prosecutor's argument that the defense theory is "absurd").

{¶ 89} Appellant asserts the prosecutor first improperly stated her personal opinion in her opening statement when she said "[t]o me it's not a self-defense case, but I'm going to talk about it." (Tr. Vol. 1 at 74.) Appellant objected, and the trial court sustained the objection. Next, appellant asserts the prosecutor improperly stated her personal opinion in her closing statement when she said:

> Officer Mackley said, we didn't secure that weapon. It wasn't a threat. There's no way this guy could even reach it. Yet, somehow just moments earlier he's got this gun in his hand. They want you to believe that, that's fine; I don't buy it.

(Tr. Vol. 5 at 1134.) Appellant again objected, and the trial court sustained the objection.

{¶ 90} We first note that appellant is attempting to predicate prosecutor error on objections the trial court sustained. As such, we may reject these claims. *Thompson* at ¶ 177; *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 162; *Viox v. Weinberg*, 169 Ohio App.3d 79, 2006-Ohio-5075, ¶ 36 (1st Dist.).

{¶ 91} Regardless, viewed in context, although the prosecutor's statements reflected her opinion, that opinion was based on the facts of the trial. *Belmonte*. Furthermore, appellant's substantial rights were not prejudicially affected. The trial court instructed the jury:

> First of all, it is your exclusive duty to decide all questions of fact that are submitted to you. In connection with this duty, you must determine the effect and value of the evidence and you must not be influenced in your decision by any sympathy, prejudice, or passion toward any party, witness, *or attorney*.
>
> * * *
>
> I want you to remember, however, that the attorneys are not witnesses. And since it is your duty to decide this case solely on the evidence which you see or hear in this case, you must not consider as evidence any statement of any attorney made during the trial.

(Emphasis added.) (Tr. Vol. 1 at 58-60.)

{¶ 92} In its written instructions, the trial court also instructed the jury they were charged with deciding the disputed facts and to apply the law given to them and that the opening statements and closing arguments of counsel were not to be considered evidence. There is no indication in the record that the jury failed to follow these instructions. Therefore, appellant's argument lacks merit.

### 3.  Statement of Personal Knowledge of Facts

{¶ 93} Appellant contends the prosecutor improperly stated personal knowledge of facts in the following exchange during cross-examination of appellant regarding the social media post:

> Q. And you told this jury yesterday, once again, something random you're just saying, correct?
>
> A. Yes.  It's actually a quote from a movie.
>
> Q. In fact, yeah.  I tried to find that quote.  You're saying it's from Doc Holliday in *Tombstone*.
>
> A. Yes.
>
> Q. Well, since I couldn't find that quote --

(Emphasis sic.)  (Tr. Vol. 5 at 942.)  At that point, appellant objected.  The court overruled the objection.  The prosecutor continued questioning appellant about the meaning of the quote and did not again attempt to state that he could not find it in the movie.

{¶ 94}  It is improper for a prosecutor in a criminal jury trial to state "what amounts to testimonial assertions under the pretext that he is merely asking a question."  (Internal citations omitted.)  *State v. Urbina*, 10th Dist. No. 15AP-978, 2016-Ohio-7009, ¶ 45.  In this case, it appears that the prosecutor began to improperly assert personal knowledge or outside research into the movie *Tombstone* into the line of questions about the social media post's meaning.

{¶ 95} However, the jury was specifically instructed "[y]ou must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered."  (Jury Instructions at 3.)  The question was not answered, the prosecutor did not reassert the quote was not in the movie, and in follow-up questions appellant had the chance to clarify the quote did not actually include the word "tombstone" but, instead,

appellant wrote "becomes tombstone" as a reference to the movie itself. (Tr. Vol. 5 at 946.) Moreover, whether or not the quote was from or referencing to the movie had little, if any, impact on whether it was nonetheless a veiled threat or not. Considering the above, we do not find appellant was deprived of a fair trial.

### 4. Curative Instructions

{¶ 96} Appellant challenges the trial court's failure to provide curative instructions in several of the situations already addressed: after sustaining the objection to the duty to avoid comment (rather than question) made by the prosecutor; after refusing to remedy the prosecutor's comment in his closing argument that appellant admitted murder; and after sustaining objections to the prosecutor's statements of personal opinion.

{¶ 97} Appellant requested a curative instruction regarding the prosecutor's comment in his closing argument that appellant admitted murder, which the trial court declined to do because of the untimely objection. We have already found the prosecutor did not misstate the law within the context of the closing argument. Therefore, no curative instruction was necessary.

{¶ 98} Appellant did not request curative instructions in the remaining challenges. In general, where a party fails to follow up its objection with a request for a curative instruction, that party waives its right to assert the error on appeal. *State v. Alexander*, 10th Dist. No. 06AP-647, 2007-Ohio-4177, ¶ 36. Therefore, appellant waived review of this issue, and we decline to address it for the first time here.

### 5. Strength of Evidence

{¶ 99} Appellant argues the evidence supporting appellant's guilt was not strong enough to overcome the prosecutorial misstatements in this case, which potentially lead jurors to completely ignore the self-defense evidence completely. Considering the trial as a whole, we find it clear, beyond a reasonable doubt, that the jury would have found appellant guilty even absent any misconduct. *Thompson*, 2014-Ohio-4751, at ¶ 162 (internal citation omitted) ("We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even absent the [prosecutorial] misconduct."); *State v. Smith*, 14 Ohio St.3d 13, 15 (1984). Thus, appellant's substantial rights were not prejudicially affected in this case. *Thompson.*

{¶ 100} Accordingly, we overrule appellant's first assignment of error.

**E. Plain Error Due to Prosecutorial Misconduct (Second Assignment of Error)**

{¶ 101} In his second assignment of error, appellant contends that plain error based on prosecutorial misconduct denied him of his right to a fair trial. For the following reasons, we disagree.

{¶ 102} As we recently stated in *Urbina* at ¶ 43:

> For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002 Ohio 68, 759 N.E.2d 1240 (2002).

We take " '[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Thompson* at ¶ 73, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 103} First, appellant argues additional instances of the prosecutor discussing the "duty to avoid trouble" amounted to plain error. This argument fails for the same reason as outlined in the above response to the first assignment of error. We find the prosecutor's statements regarding the "duty to avoid" to be proper, the jury was properly instructed as to the elements of self-defense, and there is no indication the jury failed to follow the instructions. Therefore, we find no plain error in this regard.

{¶ 104} Next, appellant argues the prosecutor expressed his own opinion of appellant's guilt when, in his closing argument, the prosecutor stated "[n]o matter what we decide, no matter what we do, Joe Bythewood is dead in the ground. So, yeah, he did it; no, I don't believe it's in self-defense." (Tr. Vol. 5 at 1171.) However, a review of the context of that statement, although not the most clearly stated, shows the prosecutor was discussing the hypothetical situation of jury members erroneously putting themselves into the scene of the crime or family and deciding the case on sympathy, bias, or prejudice. The prosecutor discouraged this impulse and went on to lay out the elements of self-defense. Therefore, on this record, we disagree the prosecutor was actually expressing his own opinion of guilt and find no plain error.

{¶ 105} Appellant additionally argues the prosecutor improperly appealed to the emotions of the jury in seeking to have Alexis's 911 call—which contained her stating "[o]h, my God" multiple times, that she was scared, and that there was too much blood, "[t]his is my dad" and "this is my daddy," pleads for medics to hurry, and crying—to be played for the jury. (Tr. Vol. 3 at 406-07.) Appellant contends the call added nothing to appellee's case and was played to appeal to the jury's emotions. Before the 911 recording was played, defense counsel objected on the basis that the recording was "duplicitous and place[d] undue emphasis on Alexis's] testimony" but did not object on the ground that the 911 call was unfairly prejudicial.[1] (Tr. Vol. 3 at 403.) The trial court permitted the recording to be played as a present sense impression. The jury in its deliberations asked for timestamps of the 911 calls.

{¶ 106} "Prosecutors may not deliberately saturate trials with emotion and a conviction based solely on the inflammation of fears and passions, rather than proof of guilt." *State v. Weston*, 7th Dist. No. 12 MA 122, 2014-Ohio-4252, ¶ 58, citing *Keenan*, 66 Ohio St.3d at 409. However, 911 calls may be relevant and probative, for example, in determining the timing and sequence of events and in testing the consistency of a witness's account. *See State v. Brodbeck*, 10th Dist. No. 08AP-134, 2008-Ohio-6961, ¶ 54 (discussing alleged inconsistencies between 911 call and stipulations and witness testimony); *State v. Sprouse*, 10th Dist. No. 05AP-467 (Aug. 17, 2006) (discussing allegedly highly prejudicial 911 call demonstrated sequence of events and helped to lend credence to victim's account).

{¶ 107} We note, in this case, the jury asked for timestamps of the 911 call, implying it found it useful in making its determination in a manner outside of its emotionally charged content. Based on this record, appellant has not shown that the prosecutor improperly sought to incite emotion or sympathy in playing the 911 call from Alexis, and we find its use was reasonably calculated to assist the jury in understanding the sequence of events and in evaluating the evidence.

{¶ 108} Furthermore, the trial court instructed the jury to consider all the evidence without bias, sympathy, or prejudice. An appellate court presumes that the jury follows

---

[1] Appellant concedes that plain error applies.

the trial court's instructions.  *McKelton*, 2016-Ohio-5735, at ¶ 190.  Therefore, we disagree that any error in this regard would have affected the outcome of the trial.

{¶ 109} Finally, appellant urges this court to collect all the alleged misconduct and determine whether, in its entirety, it denied him a fair trial.  In order to consider whether cumulative error is present, we must first find that multiple errors occurred in the case. *State v. Clay*, 4th Dist. No. 11CA23, 2013-Ohio-4649, ¶ 88; *State v. Goff*, 82 Ohio St.3d 123, 140 (1998).  Because we have found that the trial court did not commit multiple errors, the cumulative error principle is inapplicable.  *Clay*; *Goff*.  Regardless, none of the alleged conduct, viewed individually or in the aggregate, deprived appellant of a fair trial. *Thompson*, 2014-Ohio-4751, at ¶ 208, citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 182.

{¶ 110} Accordingly, we overrule appellant's second assignment of error.

**F.  Curative Instruction (Third Assignment of Error)**

{¶ 111} In his third assignment of error, appellant contends the trial court committed prejudicial error and denied him a fair trial by failing to give curative instructions to the jury when the prosecutor stated that appellant admitted "murder" by raising self-defense and that the burden of proof on the murder count was "done" as a result.  (Appellant's Brief at 39.)  While defense counsel objected and asked for a limiting instruction, he did so after the closing argument.  The trial court did not opine on whether the statement was in error but refused to issue a limiting instruction since an objection was not contemporaneously filed.

{¶ 112} As addressed in the first assignment of error, we do not find that the prosecutor's comments during the closing argument amounted to error.  The prosecutor repeatedly emphasized that appellee had the burden to prove each element of the charged offenses beyond a reasonable doubt and was making the point the appellant admitted to purposeful killing, which, pursuant to R.C. 2903.02, is defined as "murder."  The prosecutor then went on to discuss self-defense and her argument as to why the evidence shows he was not justified in killing his father.  As a result, we disagree with appellant that a curative instruction was necessary in this case.

{¶ 113} Accordingly, we overrule appellant's third assignment of error.

**G. Cumulative Effect of Errors (Sixth Assignment of Error)**

{¶ 114} Under his sixth assignment of error, appellant contends the trial court committed prejudicial error and denied him a right to a fair trial through the cumulative effect of evidentiary errors at trial. We note that although the assignment of error refers to "evidentiary" errors, appellant also incorporates contentions regarding prosecutorial misconduct. (Appellant's Brief at 53.)

{¶ 115} "Pursuant to the doctrine of cumulative error, a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error." *State v. McClurkin*, 10th Dist. No. 11AP-944, 2013-Ohio-1140, ¶ 61.

{¶ 116} First, appellant contends the trial court erred in admitting Alexis's 911 call, as it violated Evid.R. 403(A) by causing unfair prejudice to appellant. Evid.R. 403(A) covers the mandatory exclusion of relevant evidence and states "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *State v. Ollison*, 10th Dist. No. 16AP-95, 2016-Ohio-8269, ¶ 42. Generally, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62.

{¶ 117} Appellant points out that Alexis had already testified and contends the call added nothing to her testimony and instead only served to inflame the emotions of the jury. We disagree the 911 call only served to inflame the jury. This is a case where the identity of the shooter was established and largely turned on who the jury thought was telling an accurate account of the evening—who the jury believed. Because credibility mattered so much here, the probative value of "neutral" evidence bearing on the actual events, such as the 911 call, increased. Furthermore, although the 911 recording of the daughter of the victim in her father's final moments is emotional, we cannot say its probative value is substantially outweighed by the danger of unfair prejudice to warrant mandatory exclusion. Evid.R. 403(A). Therefore, we find appellant's argument lacks merit, and the trial court did not abuse its discretion in admitting the 911 call.

{¶ 118} Appellant's next argument in support of cumulative error points to the prosecutor's alleged misstatement of the law of self-defense on the duty to avoid and the prosecutor's statement of personal knowledge of facts (the *Tombstone* quote). We have already determined that the prosecutor did not misstate the law of self-defense but did improperly attempt to assert personal knowledge of facts based outside the record. As a result, considering all the above, the trial court did not commit multiple errors, the cumulative error principle is inapplicable. *Clay*; *Goff*. Moreover, we disagree with appellant's assessment that the prosecutor's alleged misstatements of law, assertions of personal opinion, personal knowledge of facts, appeal to the jury's emotions, without curative instructions, and evidentiary errors resulted in cumulative error and denied him a fair trial.

{¶ 119} Accordingly, we overrule appellant's sixth assignment of error.

## H. Ineffective Assistance of Counsel (Fifth Assignment of Error)

{¶ 120} In his fifth assignment of error, appellant contends his defense counsel rendered ineffective assistance. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that trial counsel's performance fell below an objective level of reasonable representation and that the defendant suffered prejudice as a result. *Oteng*, 2015-Ohio-1231, at ¶ 86, citing *Strickland v. Washington*, 466 U.S. 668 (1984).

{¶ 121} Appellant argues counsel was ineffective for a number of issues previously raised in this opinion: failing to object to the prosecutor's conflation of elements of the self-defense test during the opening statement, the cross-examination of appellant after being overruled and then sustained, and the closing argument; failing to timely object to the prosecutor's misstatement of law that appellant admitted murder; and objecting to the 911 call on the wrong basis. However, failure to object to error alone ordinarily is not enough to sustain a claim of ineffective assistance of counsel. *State v. Holloway*, 38 Ohio St.3d 239 (1988). *See also State v. Gumm*, 73 Ohio St.3d 413, 428 (1995) (stating defense counsel's failure to object to prosecutorial misconduct "does not constitute ineffective assistance of counsel per se, as that failure may be justified as a tactical decision"); *Strickland* at 689, 690, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955) (stating that counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action

'might be considered sound trial strategy' ").  Furthermore, we have already concluded the arguments posed by appellant here lack merit, and, as a result, an objection on the grounds of prosecutorial misconduct alleged by appellant or the 911 call on the basis asserted by appellant would not likely have been successful.  Therefore, trial counsel was not ineffective for failing to raise those objections.

{¶ 122} Finally, appellant argues his trial counsel's many errors, when considered together, deprived him of a fair trial.  However, as we have previously concluded trial counsel did not err in the manner alleged by appellant, we find no merit in appellant's cumulative error theory.  Accordingly, appellant's fifth assignment of error is overruled.

## IV.  CONCLUSION

{¶ 123} Having overruled appellant's eight assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, J., concurs.
TYACK, J., dissents.

TYACK, J., dissenting

{¶ 124} I would find that repeated prosecutorial error damaged the integrity of the factfinding in the trial.  I would therefore vacate the conviction for murder and remand the case for a new trial.

{¶ 125} Joseph T. Shine-Johnson was summoned home by his father.  Shine-Johnson went home.  His complying with his father's demand had nothing to do with any duty to retreat or any duty to avoid injuries.  The State of Ohio had simply no legal basis for arguing otherwise.  A person who is summoned home by a parent has a right to go home, even if the person summoned fears that bad things could happen once the person arrives home.  The prosecution's assertion otherwise had and has simply no merit.

{¶ 126} Further, a person has no duty to retreat from the place where the person is living.  Ohio law is crystal clear on that point.  The issue of self-defense should have been litigated free of the improper argument by the State of Ohio that Shine-Johnson had to retreat from his residence rather than confront his irate father, who had summoned him home.  The argument that Shine-Johnson was more likely to be culpable because he did what his father demanded and went home conflicts with common sense and Ohio law.

{¶ 127} Prosecuting attorneys are supposed to seek justice, not seek convictions any way they can get them.  That did not happen here.  The conviction for murder in particular was tainted and therefore should be vacated.  The case should be tried again, this time free of improper assertions and arguments on the issue of self-defense.

———————————